STATE v. MOSES BARNETT.[1]

January 25, 1935.

No. 30,050.

[1]Reported in 258 N. W. 508.

*A. M. Cary* and *Mark J. McCabe,* for appellant.

*Harry H. Peterson,* Attorney General, *Roy C. Frank,* Assistant Attorney General, *Ed J. Goff,* County Attorney, and *William G. Compton,* Assistant County Attorney, for the state.

JULIUS J. OLSON, JUSTICE.

Defendant was convicted of assault in the first degree. Thereafter the county attorney filed information against him of prior conviction. Trial thereon was duly had and a verdict of guilty rendered. Judgment of conviction pursuant to the verdicts was thereupon entered by the court and defendant sentenced to an indeterminate term at the state prison at Stillwater. He moved, unsuccessfully, for new trial in each case. The cases come to us for review upon appropriate appeal.

The evidence in the assault case would have justified a jury in finding these facts: On and prior to March 1, 1927, one Philip Moses was secretary and manager of the Twin Cities Cleaners & Dyers Association. The association was organized to regulate and control prices in Minneapolis and St. Paul. The manner in which

the association conducted its business and the interest that Philip Moses had therein are adequately referred to in the case of In re Disbarment of Moses, 186 Minn. 357, 243 N. W. 386.

For several years prior to 1927 Sam Shapiro, the complaining witness in the assault case, conducted a tailor shop in Minneapolis. In the early part of that year he entered into a copartnership arrangement with one Moorvitz to go into the dry cleaning business. They built a stone-cement building in the rear of Shapiro's establishment and also constructed underground tanks for storing gasolene to be used in that business. These tanks had a capacity of 1,500 gallons and were connected with pipes leading to the top of the ground, where they were capped and provided with locks. Before the dry cleaning plant was opened for business Moses went to Shapiro (June 28) and threatened him with violence if he entered into the dry cleaning business. On July 10 Shapiro's underground gasolene tanks were molested by someone. The locks attached to the top of the pipes were broken, and sulphuric acid had been poured into the tanks. On the morning of July 29 defendant called upon Shapiro at his place of business accompanied by a man named Pat. He informed Shapiro that he desired to have a talk with him about the dry cleaning business. Defendant was a stranger to Shapiro. Upon being asked with regard to his business, defendant said his name was Mose Barnett, and he braggingly asserted that he was the man who had shot Roy Rogers at Sixth and Hennepin. He also informed Shapiro that he had been sent by the Twin Cities Cleaners & Dyers Association to settle the damage that had been done to Shapiro's property on July 10. As a condition to accomplish settlement defendant said that it would be necessary for Shapiro to join the association and that he promise to be "a good fellow." Considerable talk was had back and forth, and it was finally suggested by defendant that a settlement could be made by the association paying $1,000 to Shapiro for the damage done July 10. Shapiro testified that he told defendant he would do this because "I realize that I am not strong enough to fight with a gang like yours, and I am going to compromise with you and take that settlement, provided you lay off from me and

leave me attend to my business to provide a living for my family." Defendant told Shapiro immediately before leaving that he would be back at two o'clock in the afternoon of that day with the money. At the appointed hour the defendant came back with Philip Moses. Moses told Shapiro that before they would pay the $1,000 damages it would be necessary for Shapiro to join the association and also promise to turn over all of his wholesale business to the association and that he would then be given such share of the business as the association saw fit to assign to him. There were other requirements to be complied with by Shapiro before a settlement could be made effective. Shapiro refused to make any such bargain, and defendant threateningly said: "Sam, you better mind us, you can't afford to be where you are. * * * You have got to mind us and be a good boy." Shapiro still refused. Defendant became angry, called him a "stubborn fool," and said, "You will feel sorry for it." On August 9 Shapiro received a letter and an application blank from the association. On August 19 defendant called Shapiro over the telephone and said: "Did you get a letter from· the association?" Upon receiving an affirmative reply, defendant said: "Did you make up your mind to join the association?" The answer was "No." Thereupon defendant said: "That is your last chance, if you don't do what I tell you, I will wipe you out, and there wouldn't be a smell left of you, you stubborn fool." On Thursday or Friday preceding September 20, one Karl Levi, a dry cleaner, called at the office of Philip Moses to talk about dry cleaning service, claiming that he had trouble in procuring such. He told Moses that he intended to have Shapiro do his work. Moses said that "within the next few days one of the dry cleaning plants will be blown up." During the forenoon of September 20 four men entered Shapiro's place of business with drawn guns. They threw all the clothing in his place on the floor and sprayed same with sulphuric acid and threw stink bombs. One of these men hit Shapiro over the head with the butt of his gun, inflicting a rather severe injury and saying as he did so, "That is what you are getting for being a stubborn fool." Considerable damage was done to Shapiro's business because the sulphuric acid destroyed the

clothes that he had in his shop for dry cleaning. He estimated his loss at $8,000. On November 1, 1927, this defendant, Philip Moses, and two others were indicted for this assault. During all the time hereinbefore recited defendant was a resident of Minneapolis. After the indictment had been found the sheriff's office was unable to locate him. On November 20, 1933, defendant surrendered himself, was duly arraigned, and his case set for trial. The result of that trial has already been indicated. Defendant did not testify in either case.

Defendant devotes more than 28 pages of his brief to his assignments of error, grouped thus:

"Our main point in this case is that the evidence is wholly insufficient to warrant or to sustain the conviction.

"The numerous assignments of error can be grouped under the following heads, which cover all the assignments urged:

"A.   There was no basis for the action in the first instance.

"B.   The clerk's records do not show that defendant had his statutory and constitutional rights of proper arraignment and notice of the charge against him.

"C.   The errors in the court's rulings on the admission and rejection of evidence."

■ The state does not claim that the defendant was physically present at the time the assault was committed upon complaining witness. It seeks to hold defendant responsible under the provisions of 2 Mason Minn. St. 1927, § 9917, which reads thus:

"Every person concerned in the commission of a crime, whether he directly commits the act constituting the offense, or aids and abets in its commission, and whether present or absent, and every person who directly or indirectly counsels, encourages, hires, commands, induces, or otherwise procures another to commit a crime, is a principal, and shall be indicted and punished as such."

Under this section all persons concerned in the commission of a crime may be indicted and punished as principals.   (See cases cited under 2 Mason Minn. St. 1927, § 9917.)   From the facts here-

tofore related and the inferences to be drawn therefrom, it seems reasonably clear that there was a combination or conspiracy to compel Shapiro and others to pay tribute to the racketeers represented by Philip Moses and defendant. That these conspirators or their agents had destroyed Shapiro's property and that one of them had attacked his driver are facts which cannot very well be disputed. Defendant had sought to settle for such destruction and to prevent the prosecution of the driver's assailant. He and Philip Moses had made numerous threats of violence to Shapiro's person and to destroy his property. When shortly before this assault took place Philip Moses was advised by a prospective customer of Shapiro's that he proposed to have Shapiro do his dry cleaning and the significant remark was made that a dry cleaning establishment would soon "be blown up," no reasonable mind could interpret it otherwise than as a direct threat against Shapiro. Coupled with these convincing facts was the repetition to Shapiro at the time of the assault of the peculiar words of defendant's threats, "That is what you are getting for being a *stubborn fool.*" We see no difficulty in sustaining the connection between defendant and the other racketeers who destroyed the property in Shapiro's shop and assaulted his person.

The state's case depends largely upon the testimony of Shapiro and his son. Counsel for defendant, recognizing this, subjected each to a long and grueling cross-examination. That there are inconsistencies in the testimony of these witnesses cannot be denied, nor is this unusual or surprising. But the fact that witnesses for the state differ even in matters of importance does not preclude conviction. State v. O'Connor, 154 Minn. 45, 191 N. W. 50. Defendant sat mute throughout the trial. He preferred for reasons of his own so to do. That was his legal right. The fact issues were determined adversely to his expectations. Upon the facts here appearing no sane jury could arrive at any other conclusion than that Philip Moses and defendant and their agents and associates were coöperating in the accomplishment of a common purpose, all seeking the same objective, namely, the destruction of Shapiro's right to conduct his own dry cleaning establishment in his own way.

The subsequent assault upon Shapiro's person was but the culmination of the racket, the *finale* of the conspirator's foul and unlawful designs.

■ Defendant's next claim, that the "clerk's records do not show that defendant had his statutory and constitutional rights of proper arraignment and notice of the charge against him," cannot be sustained. This stipulation appears in the record:

"On the 20th day of November, 1933, the defendant herein voluntarily surrendered and was duly arraigned in the district court of Hennepin county, his case set for trial and he was released on bail."

The stipulation effectively does away with defendant's present claim.

■ Many errors are urged in respect of the court's rulings on admission and rejection of testimony. A careful reading of the record convinces us that the trial court exercised extreme caution. The objections were of the general broadside type "objected to as incompetent, irrelevant, and immaterial." In spite of this general and insufficient manner of objecting to testimony, we find that the court carefully, fairly, and impartially ruled thereon. There is nothing in this record indicating that any substantial right of defendant has been violated. It was entirely proper for the state to introduce evidence in respect of defendant's flight from the city of Minneapolis after the finding of the indictment. 2 Dunnell, Minn. Dig. (2 ed. & Supp. 1934) § 2464; State v. McTague, 190 Minn. 449, 252 N. W. 446. The same is true in respect of motive. *Id.* § 2467. And in respect of threats the same rule holds true. *Id.* § 2468. A new trial in criminal cases should be granted cautiously and only for substantial error. 2 Mason Minn. St. 1927, § 10648; 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 2490.

The charge was fair and complete. When the court had concluded the same he asked counsel whether anything had been omitted or inadvertently misstated. Counsel for defendant said:

"The only thing, your Honor, I might suggest that the evidence excluded by you, all the rulings that you made with respect to

objection, only the evidence admitted should be regarded by the jury.

The Court: "Very well. As I have told the jury, you will consider and determine this case solely and exclusively on the testimony which you have heard from this witness stand. Any evidence which was offered by either side and rejected by the court must not be considered by you in any light in determining this case."

No further suggestion was made by counsel.

■ Only one further point remains for consideration, namely, that of defendant's prior conviction. The county attorney's information charged the defendant with two prior convictions. At the trial only one such was submitted to the jury. There was introduced in evidence an exemplified copy of a judgment of conviction had in North Dakota against one Sam Harris for the crime of grand larceny. An officer of the penitentiary who was such at the time of defendant's incarceration therein personally identified the defendant as the convicted defendant in the North Dakota case. He was also identified by another person who was a prison inmate with defendant. Defendant introduced an alleged pardon. The pardon offered and received was a conditional one. The court instructed the jury that the pardon could not be given consideration for the reason that "it was given to one Sam Harris on condition that he enlist in the United States Army, and so far as the evidence in this case shows, that condition was never fulfilled. And until that condition is fulfilled, the original sentence remains in full force and may be carried into effect. And for that reason I charge you that you will not give this pardon any effect." There can be no doubt that upon defendant rested the burden of proof that the condition upon which the pardon was granted had been complied with. 46 C. J. p. 1202 [§ 59]E; 5 Dunnell, Minn. Dig. (2 ed. & Supp. 1932) § 7296a; 3 Dunnell, Minn. Dig. (2 ed.) § 4942; State v. McLean, 157 Minn. 359, 196 N. W. 278; 16 C. J. p. 530 [§ 998]6, and p. 531 [§ 999]7, and cases cited under note 66.

The judgment of conviction and the order refusing a new trial are both affirmed.