STATE v. ALBERT EGGERMONT.[1]

November 17, 1939.

No. 32,115.

[1]Reported in 288 N. W. 390.

*Hall & Catlin* and *Thomas McMeekin,* for appellant.

*J. A. A. Burnquist,* Attorney General, *M. Tedd Evans,* Assistant Attorney General, and *C. J. Donnelly,* County Attorney, for the State.

GALLAGHER, CHIEF JUSTICE.

Defendant appeals from an order denying his motion for a new trial after conviction for grand larceny.

Appellant contends (1) that the verdict is not justified by the evidence and is contrary to law; (2) that the court erred in denying his motion made at the close of the state's case to dismiss the action on the ground that the state had wholly failed to prove the cause of action set forth in the information; and (3) that specified portions of the instructions given to the jury by the trial court were erroneous and prejudicial.

The crime with which defendant is charged is defined by 2 Mason Minn. St. 1927, § 10358, which reads:

"Every person who, with intent to deprive or defraud the true owner of his property, or of the use and benefit thereof, or to appropriate the same to the use of the taker, or of any other person—

Shall take from the possession of the true owner, or of any other person, or obtain from such possession by color or aid of fraudulent or false representation or pretense, or of any false token or writing, or secrete, withhold, or appropriate to his own use, or that of any person other than the true owner, any money,

personal property, thing in action, evidence of debt, or contract, or article of value of any kind;

\* \* \* \* \*

"Steals such property, and shall be guilty of larceny."

The undisputed evidence discloses that the stolen property consisted of 46 bales of binder twine taken from a railroad car of the Chicago & North Western Railway Company at Minneota in Lyon county on the night of July 7, 1938, by James and Leonard Kiley and loaded onto their truck, which they then drove to the farm home of one Charles Kerkaert, residing a few miles from Minneota, who refused to permit the twine to be there unloaded. It was then driven to the farm of Maurice Anseeuw, who allowed it to be left on his premises until the following morning, when it was taken by the Kileys and returned to the railroad company. It is the manner in which defendant was connected with these operations that is important for present purposes.

Lewis Carlson, a resident of Minneota and a witness for the state, testified that he saw defendant downtown in Minneota at about 8:30 on the evening of July 7, and that he, together with the Kiley brothers, got into defendant's car and drove around town for some time. They then parked in front of the local poultry house, which is within a few blocks of the scene of the alleged crime, and engaged in a conversation which finally centered on the subject of twine. James Kiley stated that he knew where there was a whole carload of that commodity, and his brother Leonard said, "Let's go get it." Defendant drove the car downtown; the Kileys got out and went to their truck, leaving defendant and Carlson in the automobile. Proceeding to the tracks on which the carload of twine was located, Carlson and defendant saw that the truck which the Kileys had obtained was stuck in the tracks, and the latter, after asking the former if he wished to push them out, stopped his car so as to permit Carlson to do so. Carlson returned to the car and drove back to the business district with defendant, where they engaged in a conversation with John Bernardy, Minneota policeman, after which they re-

turned to the tracks in time to see the Kiley brothers leaving. They continued driving along the highway for a short distance and then stopped to permit Leonard Kiley, who got out of the truck, to join them. Not long thereafter the occupants of the car followed the truck out of Minneota to the south for about a mile, where they met James Kiley, who had driven the truck to that point. There ensued a discussion as to what was to be done with the twine, and in the course thereof defendant said he thought he knew a place where they could leave it. Then followed a journey to the home of one Charles Kerkaert, where defendant got out of his car, talked with the owner, and returned to his car to proceed to the farm of Maurice Anseeuw, where, after arrangements were made with Anseeuw by defendant, the twine was left until the following morning.

Charles Kerkaert, testifying on behalf of the state, described how he was called to the door of his farm home by defendant and proceeded:

"He came up and asked me if he could leave some twine here and I said: 'What kind of twine?' 'Well,' he said, 'the boys have some twine they took at Minneota and they want to leave the twine here,' and he said: 'I haven't got anything to do with it.' And I asked him what he had to do with it, and he said: 'I have not got anything else to do with it except that I am along with them and I want to help them out.' And I said: 'I don't want to have anything to do with it either.' And then they went away."

Maurice Anseeuw, also called by the state, testified that the Kileys, Carlson, and defendant were at his place about 11:30 or 12:00 the same night; that he went to the door of his house and there saw defendant standing alone; that defendant said, "They have some stuff out here that they want to leave," and that he (Anseeuw) permitted them to put the twine in the loft of his barn; that he and Leonard Kiley went up to the loft and the other three threw the twine up to them from the truck.

Other witnesses called by the state included the Kiley brothers, Mrs. Anseeuw, wife of Maurice; John Bernardy, the policeman referred to above; Joe S. Schmiesik, an employe of the Standard Oil Company in Minneota, who saw the truck and defendant's car near the scene of the crime; and Ed Van Loy, a resident of Minneota who made observations similar to those of Schmiesik. The testimony of these witnesses supports that which has previously been set out in detail.

Defendant, testifying in his own behalf, gave an explanation of his acts which would lead to the conclusion that he was innocent of any criminal intent, and Gust DeMartelaere testified that he saw the defendant and the Kileys on the evening of July 7 and overheard no talk of twine.

From the testimony of the witnesses for the state the jury could reasonably have concluded that defendant knew that the Kileys intended to steal the twine and that, so knowing, he took them to their truck so they could use it to haul the twine out of the railroad car; that he went to the railroad tracks either as a "lookout" or out of curiosity and while there was instrumental in helping the Kileys get their truck to the railroad car; that at a time when he knew the Kileys were engaged in unloading the twine onto the truck he was engaging the local law enforcement agency in a conversation which necessarily diverted his attention from the purloining which was then taking place; that he returned to the scene of the crime and drove one of the persons whom he knew had taken the twine away from the railroad and to a place where they met James Kiley, who had the booty; that he then took the leading part in hiding the twine on a farm some distance from the place from which it was taken. As against these conclusions, we have only the testimony of the defendant himself, which of course the jury was not bound to accept.

It is provided by 2 Mason Minn. St. 1927, § 9917, that:

"Every person concerned in the commission of a crime, whether he directly commits the act constituting the offense, or aids and

abets in its commission, and whether present or absent, * * *
is a principal, and should be indicted and punished as such."

We do not see how the jury could reasonably have reached any
conclusion other than that defendant at least aided and abetted
the Kiley brothers in their crime. The evidence fully sustains the
verdict, and the court did not err in denying defendant's motion
for dismissal.

■ The court instructed the jury as follows:

"It has been suggested to you, and it is in the evidence that this
twine was returned the next day. It makes no difference whether
it was returned or not insofar as the commission of the crime
itself is concerned. That act itself does not wipe the slate clean,
as was expressed by counsel in the matter."

The instruction complained of is in harmony with 2 Mason
Minn. St. 1927, § 10373, which reads:

"The fact that the defendant intended to restore the property
stolen shall be no ground of defense, nor shall it be received in
mitigation of punishment unless the property shall have been
restored before complaint charging the commission of the crime
has been made to a magistrate."

State v. Thornton, 174 Minn. 323, 219 N. W. 176.

The other portions of the trial court's instructions to which ob-
jection is made have been examined, and we find them not preju-
dicially erroneous. See State v. Nelson, 91 Minn. 143, 97 N. W.
652; State v. Barnett, 193 Minn. 336, 258 N. W. 508.

Affirmed.