## STATE v. JAMES TSIOLIS.[1]

February 4, 1938.

No. 31,507.

[1]Reported in 277 N. W. 409.

*John G. Priebe,* for appellant.

*William S. Ervin,* Attorney General, *Roy C. Frank,* Assistant Attorney General, *Ed J. Goff,* County Attorney, and *William G. Compton,* Assistant County Attorney, for the State.

J·ULIUS J. OLSON, JUSTICE.

Defendant Tsiolis and one Prevenas were jointly indicted for the crime of arson in the first degree. Separate trials were demanded

and accorded them. We are concerned only with Tsiolis, who was tried, found guilty, and sentenced to a penitentiary term. He appeals from an order denying his motion for a new trial. Hereafter we shall refer to him as defendant.

The evidence for the state is such that the jury could find the following facts: On and prior to August 11, 1936, one Springer and wife occupied the first floor and basement of the involved premises, 1504 Hennepin avenue in Minneapolis, as a grocery store. The upper floors of the building were occupied as residential quarters by numerous other persons. At about 8:30 o'clock that evening the fire in question occurred.

Adjoining the premises mentioned and on the west side thereof was a restaurant and beer hall. A common stairway between that place and the grocery store led to the basement beneath. The fire started in the basement under the grocery store.

Springer and wife are young people who by industry and thrift had saved some $2,000. They were brought up in the country and had no prior experience in any business venture when in 1933 they purchased the stock and fixtures in this place under contract. Their entire savings were invested in this venture. In the fall of 1935 Springer, finding his business unsatisfactory, concluded to make a sale thereof and, to the accomplishment thereof, placed advertisements in one of the Minneapolis papers. About February 1, 1936, defendant appeared at the store in response to one of the advertisements and inquired if the place was still for sale. He was informed that it was. His inspection of the place was casual, and he left, stating that he would call again soon. He did so about a week later, at which time his inspection was more complete but said he would again return to the store, leaving the impression that he was interested as a prospective buyer. Something like a week later he and the other defendant, Prevenas, appeared, the latter being introduced by defendant to Springer. Defendant wanted to know about the insurance on the place and was informed by Springer that he carried $4,600 of fire insurance. This seemed to interest both defendant and Prevenas. Defendant asked Springer if he

wanted the place burned down, suggesting this would be a good way to get his money out of the store. He offered to do the job for $600, but Springer refused to enter into such deal and spurned the offer. Not long thereafter Springer met Prevenas, defendant, and a third party at the apartment of Prevenas on Oak Grove street in Minneapolis. The same question was gone into, namely, that of burning the store for the insurance money. About a week later defendant again went to the Springer store informing the latter that he was going to Chicago to get some stuff to burn places. He showed Springer photographs of places that had been burned. Sometime later he went back to the store, said he was just back from Chicago, and that he needed some money. Springer said he did not owe him anything and did not want any dealings with him. But defendant was insistent. He needed money and wanted it badly. Springer finally said that he would let him have $50 provided he would thereafter be left alone and not subjected to the pressure that had been brought to bear upon him by these men to burn the structure. A few days later Prevenas appeared at the Springer store and said that he wanted $50 for defendant. Springer was threatened that he had better go through with the deal, otherwise he might be taken for a one-way ride. Some three weeks later Prevenas went back to the store with a paper carton containing four one-gallon cans which he placed in the rear of a partition in the store. About a week later Springer took the carton and its contents into the basement, placing it against the west wall near the center. He then unscrewed the top of one of the cans and smelled the contents. He thought it smelled like gasolene. Mrs. Springer had previously opened one of them, and she too testified that the contents smelled like gasolene.

During the latter part of June, Prevenas again went to Springer's store and went with him into the basement, entering through the back door. At that time Prevenas dumped the contents of the cans into a tub. Springer later poured the contents into a five-gallon container which he placed close to the wall about ten feet from the front of the store. At the suggestion of Prevenas, Springer and

wife took the four empty one-gallon cans and dumped them somewhere along Cedar Lake road and Sixth avenue north.

Defendant did not again appear upon the scene, but Springer did pay Prevenas $60 in cash which the latter said was to go to defendant. Springer, because of the threat made about being taken for a one-way ride, reluctantly paid the money. He also executed, payable to Prevenas, a $300 note to be paid when the insurance on the Springer store was collected. Both Mr. and Mrs. Springer testified for the state.

On the evening of August 11, 1936, the date of the fire, Springer and wife closed the store at about eight o'clock. They locked the doors in the customary way and went to their home. They were informed of the fire about nine o'clock. Both testified that they did not set the fire and they did not know who in fact set it.

The captain of the fire department and the firemen who were present at the time the fire was sought to be put out testified that when they arrived at the scene there was thick, black smoke emanating from the basement, indicating that some inflammable liquid was burning; that after they went down into the basement an explosion took place, knocking one of the men down; that during a considerable portion of the time the water thrown upon the fire seemed to have no effect on it. In their opinion the fire was one called a "boosted fire," that is to say, one helped along by some volatile, inflammable liquid which apparently had been sprayed on the floor joists supporting the first floor of the building. Photographs of the basement and first floor of the building indicate that the joists supporting the first floor had burned to such extent as to throw the contents of the store into the basement. The floor had collapsed because the supporting timbers had been destroyed by the fire. There was no heating plant in the basement under the store; nor was there anything therein to cause a fire or furnish the material from which heat in any dangerous quantity was likely to arise. Hence, so the state contends, the necessity for furnishing the material to bring about the quick and intensive heat needed to make the job a real and effective one.

There is also testimony by one Stamas that he knew both defendant and Prevenas. Shortly after the fire took place he had a conversation with defendant in which he was told that he, defendant, knew in advance that the Springer store was to be burned; that Prevenas had put the stuff in there with which to do the job; that defendant was present at the Oak Grove apartment when Prevenas, one Bezas, and Springer were present, and that they had at that time talked about burning Springer's store.

Defendant testified as to his past activities extending over a period of many years. He had been engaged in many lines and had much and varied experience with fire losses. Respecting the present case, he denied the testimony of Springer and wife, claiming that the suggestion of burning the building came from Springer and that he (defendant) had spurned the proposition and refused to go through with it. He does admit, however, that he was present at the Oak Grove apartment where this subject matter came up but that he turned it down coldly and refused to have anything to do with it. He denied *in toto* Springer's testimony with respect to conversations had relating to the trip to Chicago for the purpose of procuring material with which to set fires; denied showing any pictures of places that had been burned; and denied receiving any money from Springer. He denied the testimony of Stamas with regard to having made any admissions of the burning of the Springer store. He also denied Stamas' testimony with regard to burning other places in which he had been interested in the past. He was adequately supported with respect to an alibi, the claim being that he was entertaining a party of friends from seven o'clock that evening until after nine o'clock. Some evidence was also introduced in his behalf tending to show his good moral character.

The state offered in rebuttal the testimony of assistant fire marshal Wilson and others as to statements made by defendant after the fire. A stenographic transcript of his statements then made was exhibited to defendant and his counsel at the trial. Defendant admitted the correctness thereof except in a minor particular. The statement was admitted in evidence.

We refrain from making further comments respecting the facts but reserve such as may be considered important under subsequent subdivisions of the opinion.

■ Defendant's motion to dismiss at the close of plaintiff's case was denied. He thereupon proceeded with his defense as heretofore outlined. The question presented has been determined adversely to defendants' contentions in several cases. In State v. Omodt, 198 Minn. 165, 170, 269 N. W. 360, 363, we said:

"Defendant also claims error in that the court refused to dismiss when the state rested. It is claimed that at that time the evidence did not justify a verdict of conviction. We are not impressed that this is so. Furthermore, in a criminal as well as in a civil case, 'a new trial will not be granted for refusal to dismiss when the state rested, if the evidence as finally in warrants the conviction.' State v. Baker, 161 Minn. 1, 200 N. W. 815."

And in State v. Traver, 198 Minn. 237, 238, 269 N. W. 393, we said:

"If after denial of his motion to dismiss defendant elects to proceed further and present evidence on the issue or issues and further evidence is received, whether by defendant's witnesses or by the state, the question of the sufficiency of the evidence to sustain the verdict or decision is then to be determined on appeal by a consideration of all the evidence presented in the case."

■ Error is claimed in that the court permitted the state to go into other similar crimes and that this resulted in prejudice to defendant. An investigation of the record discloses that defendant himself brought this subject before the court and thus removed all bars to his past conduct in respect of other fires. It appears that while he was being examined in his own behalf counsel for the state objected to the introduction of "this man's wanderings over the country" and the many enterprises in which he had been engaged. His counsel stated, in support of letting the testimony go in, "personally, I am interested and I guess everybody else is *whether he has had any fires in any of these places.*" In conduct-

ing the examination defendant's counsel put such questions as these: "Now, during the time you were operating the New Palace Cafe, Mr. Tsiolis, did you have any *serious fires* at the New Palace Cafe?" Also, "In all these places of business you have enumerated, 16 different places that you have been interested in, Mr. Tsiolis, have you ever had any *serious fire?*" (Italics supplied.) Defendant replied that he had two or three fires in the Palace Cafe, one in Regina, Saskatchewan, one in the Radisson Cafe, and one in Aberdeen, South Dakota. Of course, these fires were not considered *serious* by him, although in one of them, Paramount Cafe in Minneapolis, he collected $8,200 of insurance money. There, too, the floor collapsed in a manner similar to the collapse that took place here. Naturally enough, counsel for the state went into defendant's past history with commendable thoroughness to ascertain not only the *seriousness* of other fires but also other circumstances surrounding them. That defendant's story and claim of innocence was demolished by the cross-examination clearly appears from the record. When he left the witness stand he was obviously a much discredited witness. No one reading the present record can doubt that his own testimony was a most potent factor in bringing him to justice. In State v. Ahlfs, 164 Minn. 110, 116, 204 N. W. 564, 566, a similar question was presented and there disposed of: " * * * after having introduced the subject of other fires himself, defendant is not in a position to complain of this incident."

■ It is also urged that Springer and wife were accomplices, hence that there must be adequate corroboration before conviction may be had. It is well in this connection to refer to some additional facts, including also defendant's testimony on cross-examination. Therein he conceded having visited at the Springer store at least three times, also of being present at the meeting at the Oak Grove apartment. Of course he denies that he said anything indicating any interest on his part in what was being talked about. But it is significant that he and his codefendant, Prevenas, were long-time friends. He admits in his talk with Springer at the store that something was said about selling the property "to the insurance company," but he claims this statement came from Springer,

who, so he claims, added that he (Springer) knew that defendant had had a fire while at the Palace and thought he knew something about fires, to which defendant claims he replied, "You have the wrong man," and then left.

With regard to a fire at Rawlins, Wyoming, defendant testified that he was there on a visit some three years prior to the trial. Stamas, testifying for the state, said that defendant had shown him a fire insurance policy on that place; that he was going to burn the insured property, and later told the witnesses that he did so, going to Denver in sufficient time to have an adequate alibi. Many of these questions on cross-examination were not objected to by defendant's counsel. In fact, while this cross-examination was going on, his counsel said, "Mr. Tsiolis, answer Mr. Compton's questions, please." Not to be overlooked, *the place was destroyed by fire.* This man further testified that he said to defendant, "Jim, are you guilty of this fire?" To which defendant replied: "Well, I told you that I was in the deal, but you had no business to trap me." He also had told the witness that he had collected money from Springer.

With regard to fires at the Palace Cafe and at Cicero, Illinois, it appears that defendant talked to one Braun of the National Board of Fire Underwriters about both of them. As to the latter, Braun testified on rebuttal that defendant had told him he knew that fire was going to take place; also that he offered to testify against Stamas in a Chicago arson case if Braun would pay him $5,000. He told the witness that he "hated to double-cross a friend, but for $5,000 he would testify against Stamas." There is much more of this same kind and other misdeeds, such for instance as having been engaged in violating the prohibition law and having been convicted for that offense while in South Dakota.

In State v. McTague, 190 Minn. 449, 455, 252 N. W. 446, 448, we said:

"The defendant testified in his own behalf. He could have been asked on cross-examination about former convictions, for the statute makes them competent upon credibility. 2 Mason Minn. St. 1927,

§ 9948; 6 Dunnell, Minn. Dig. (2 ed.) § 10309. He may be cross-examined, as a defendant who is a witness for himself in a civil action, upon collateral matters to affect his credibility and to discredit him. To some extent the state may go into his life. It is said that the defendant, being a witness, cannot assert a right to remain wholly a stranger to the jury; but in a general way the state may show what manner of a man he is. \* \* \* An exact line cannot be drawn between what is permissible and what is forbidden cross-examination upon collateral matters; and it has come to be recognized as the correct rule that the extent of the cross-examination upon collateral matters is largely discretionary with the trial court."

Here, as in the cited case, the state "cross-examined the defendant upon his prior life. Naturally enough it was unfavorable to the defendant." (190 Minn. 455.) We cannot say, nor do we believe, that the record discloses any violation of the court's exercise of judicial discretion.

The court charged the jury on the subject of corroborating evidence as follows:

"Our statutes further provide that a conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

"The statute last quoted does not require that a case be made out against the defendant sufficient for his conviction, before the testimony of an accomplice can be considered. The corroborating evidence required must, however, independently of the testimony of the accomplice, tend in some degree to establish the guilt of the accused, but need not be sufficiently weighty or full as, standing alone, to justify a conviction. It need not be direct and positive, but may be circumstantial.

"Whether the state's witness Springer was an accomplice is for you, the jury, to determine.

"If you find that the witness Springer was an accomplice of the defendant, then the statute already referred to applies, and you cannot convict the defendant upon the testimony of the witness Springer, unless you find such testimony to be corroborated by other credible testimony in the case. The state claims, however, that even if you should find the witness Springer to be an accomplice, his testimony has been amply corroborated. Whether it has been corroborated, and the credibility and weight of his testimony and of any and all corroborating testimony, are all matters for you to determine."

We can find no fault with this charge. See 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934, 1937) § 2457, and cases cited under notes. As a matter of fact, the testimony of defendant, even without the other corroborating evidence here shown, might well lead one to believe that defendant's guilt was for the jury.

■ The state does not claim defendant's physical presence at the time of the setting of the fire. What it seeks to do is to hold defendant responsible under the provisions of 2 Mason Minn. St. 1927, § 9917, which reads:

"Every person concerned in the commission of a crime, whether he directly commits the act constituting the offense, or aids and abets in its commission, and whether present or absent, and every person who directly or indirectly counsels, encourages, hires, commands, induces, or otherwise procures another to commit a crime, is a principal, and shall be indicted and punished as such."

Under the provisions of the quoted section, it is clear that all persons concerned in the commission of a crime may be indicted and punished as principals. As we have seen, defendant and Prevenas were jointly indicted for this offense. The facts heretofore related and the inferences that reasonably may be drawn therefrom point unmistakably to a combination on the part of these men to bring about the destruction of the insured property for the sake of the insurance money to be had, and that, having accomplished this purpose, the remaining $300 represented by Springer's note would be paid. They were associates "coöperating in the accomplishment of

a common purpose" and seeking the same objective. State v. Barnett, 193 Minn. 336, 341, 258 N. W. 508, 510. Under these circumstances, the rule stated in 2 Dunnell, Minn. Dig. (2 ed. & Supp. 1932) § 2416, and cases cited under notes, is applicable:

"When two or more conspire to commit a felony and engage in its commission all are alike guilty. If one conspires with another to commit a crime, he is guilty of everything done by his confederates which follows the execution of the common design as one of its natural consequences, even though it was not intended as part of the original plan. Where two persons conspire together to do an act forbidden by law to one of them, the doing of it by joint agreement is a violation of law as to both. Where one is forced into a transaction by what constitutes duress he cannot be charged with a conspiracy."

We think the evidence is sufficient to sustain the conviction. The court's charge is fair, clear, and impartial. Defendant was accorded every right that belongs to any person accused of a criminal offense.

The other assignments of error have been examined and found wanting in substantial merit.

Order affirmed.

