# STATE v. KENNETH PALMER.[1]

November 3, 1939.

No. 32,045.

[1]Reported in 288 N. W. 160.

186

*Eugene A. Rerat, Parker & Parker,* and *Walter J. Welch,* for appellant.

*J. A. A. Burnquist,* Attorney General, *M. Tedd Evans,* Assistant Attorney General, *Edward J. Goff,* County Attorney, and *William G. Compton,* First Assistant County Attorney, for the State.

HOLT, JUSTICE.

About ten o'clock p. m. on January 18, 1938, Goldie Rosen was brutally assaulted and clubbed in the basement of her home, 227 West Lake street in the city of Minneapolis, this state. The injuries so received caused her death the next morning. Defendant, being indicted for the murder of Goldie Rosen, was convicted of murder in the second degree and sentenced to life imprisonment. His motion for a new trial being denied, he appeals from the order and the judgment.

There are 60 assignments of error, but they are grouped under ten points, and some of the latter need not be discussed separately. A brief statement of the circumstances surrounding the crime should be made. Mrs. Goldie Rosen owned 227 West Lake street. On the first floor was a grocery store. The second floor was occupied by her and her 14-year-old daughter Bernice as a home. There was a separate entrance to the living apartment from Lake

street and a hall from which a stairway led upstairs. On this stairway was a turn or landing. Toward the rear of the hall a door led down to the basement and furnace. The Harris Brothers had installed a furnace two or three weeks prior to January 18, 1938, and defendant was one of the men employed on the job. Bernice went down two or three times while this work was being done. She claims she knew defendant as one of the three or four men she saw at work; that she did not know his name; but that he spoke to her and asked her name. She testified that around ten o'clock, the night in question, she had undressed and was in her pajamas and blouse, telephoning to a friend and schoolmate, Sally Swartz; that during the evening her mother had told her she expected the furnaceman, as she had complained to Harris Brothers that the furnace was not heating satisfactorily; that a few minutes after the telephone talk with Sally Swartz the doorbell rang; that her mother went downstairs; that Bernice followed to about the landing, where, looking over the banister, she could see her mother draw the curtain on either side of the door to see who was there; that her mother called out "furnaceman"; that she saw defendant come in and follow her mother toward the basement door; that she opened the same and defendant followed her down; that she, Bernice, remained on the stairs a few moments and, hearing her mother scream, rushed down, met defendant on the basement stair, was struck a blow and thrown down the stairs where her mother lay bleeding and unconscious; that she tried to help her mother, and defendant came down again and struck her a blow, rendering her unconscious. Mr. Mellum, an employe of Sears Roebuck & Company, roomed at Mrs. Rosen's apartment, and on entering about 11:20 p. m. heard groans from the basement. He rushed upstairs, and on looking into the bedroom of Mrs. Rosen saw blood on the pillows of the twin beds. He ran back to the apartment of his fiancee, across the street from the Rosen home, where he had spent the evening, and telephoned the police. The police found Mrs. Rosen in a pool of blood at the foot of the basement stairway and Bernice in one of the twin beds covered to her neck with quilts. Blood was

188

found on the stairway going upstairs as well as the basement stairs, and the wall alongside, as if made by one touching with a bloody palm or fingers. Bernice, though she raised in bed and tried to brush the hair and blood from her eyes, and took a swallow of water when offered, could not speak and was apparently unconscious and remained so in the city hospital until well along in February, when she regained consciousness to some extent, but still had difficulty with her speech. About that time she contracted scarlet fever and was removed to a contagious ward, from which she was discharged March 22, 1938. She then had probably fully regained her mental faculties and gave information that led to defendant's arrest. When brought to a "showup" at the courthouse jail, where defendant was standing in a row with nine other men, Bernice at once pointed him out as the one who made the attack upon her mother and herself on January 18, 1938.

The foregoing extract from the testimony is sufficient to indicate that although Bernice was not in the basement when the murderous blows were dealt her mother she presently knew that the same person dealt her like blows. There were lights lit in the stairway, hall, and basement, according to her testimony. She knew defendant; she saw him come in and follow her mother to the basement; she heard her mother's scream; on her way to her mother's assistance she met him face to face; he attacked her. She maintained that it was defendant, and her testimony in respect to identity was not shaken by the most searching cross-examination. If her testimony be true and reliable defendant is guilty of the crime. Clearly, the truthfulness and reliability of her testimony was for the jury. The conviction cannot be said to be contrary to the law or the evidence. The verdict is adequately supported.

The defendant prior to the trial moved for the examination of Bernice by psychiatrists to ascertain her competency as a witness. The court rightly denied the motion, holding that the question of her competency was primarily for the court. When the state called Bernice, the motion was renewed and again denied. Her

examination and cross-examination cover 50 pages of the record and demonstrate that she was competent. Whether or not she had lost recollection of events observed by her at and immediately prior to her injury was for the jury. The defendant realized the importance of overcoming the force and effect of her testimony, and obtained permission of the court to have his psychiatrist, Dr. Berkwitz, in the presence of Dr. Hannah, examine Bernice, after she had testified, at the home of her sister, Mrs. Krane. Not only that, the court allowed Dr. Berkwitz to have the hospital records kept by the doctor and nurses in charge of Bernice, so as to enable him better to examine Bernice. However, defendant offered these records in evidence, and they were excluded on the ground that they were privileged, the guardian of Bernice by her attorney claiming in her behalf that they were. We need not determine whether they were privileged, for other objection was also made that they were incompetent, irrelevant, and immaterial. Neither the brief nor the motion for a new trial points to or designates what entry or fact in those records was relevant to prove that Bernice was now afflicted with retrograde amnesia. It seems to us that defendant obtained all that he was entitled to when his psychiatrist was allowed the hospital records in order fully to examine Bernice, which he did, and was subsequently permitted as an expert to discredit and impeach her testimony. We are not impressed with the controversy between the attorneys as to whether or not Dr. Berkwitz based his opinion in part upon what the hospital records showed. His opinion was received in evidence, and the jury were to judge of its value. We are not called upon at this time to decide whether the trial court rightly received the testimony of Dr. Berkwitz.

The III and IV points are that the county attorney in the cross-examination of defendant was given too wide a range in respect to his visits at the Nickelae Hotel with a woman at other times than January 18, 1938, and in permitting inquiry as to other crimes committed in connection with the one for which he admitted conviction. As to the first proposition, it is to be borne in mind that defendant brought Mrs. Rhodes in to disprove Mrs.

Cedarstrom's testimony that defendant was at that hotel on the 18th of January, 1938, by showing that the occasion was December 5, 1936, when they occupied a room, after defendant received injury to his head in an automobile accident. This opened the door to other inquiries as to the visits at that hotel, if any, with other women, for the purpose of identifying the one of January 18, 1938, and also, if possible, to support Mrs. Cedarstrom's testimony that she knew defendant from having had occasion of seeing him more than once when he engaged a room with a woman. Defendant did admit he rented a room of Mrs. Cedarstrom with a woman named Ruby sometime between February 2 and 10, 1938, though having first denied that he ever engaged a room at the Nickelae Hotel, other than December 5, 1936, with Mrs. Rhodes, then Miss Lorenz.

As to the contention that defendant's cross-examination was erroneously permitted touching other crimes, this may be said: In direct examination defendant testified that he had been convicted of the crime of grand larceny, but never served any time as he was placed on probation two years and ten months. Defendant's attorney then asked: "Did you keep your probation? A. I did." On cross-examination defendant was asked about the property he was convicted of stealing, and he answered a fur coat in a parked car, and further developed that he and a companion had stolen a truck in Hopkins and driven it to the parked car in Minneapolis having the fur coat, and that they drove away with that car, and that he was intoxicated from drinking home-brew when he stole the truck and the car with the fur coat. The justification for this cross-examination is also partly to be found in the theory of the prosecution that defendant when under the influence of liquor has the propensity to commit crime. We are of the opinion that the discretion of the court in controlling cross-examination was not abused. The law as to the cross-examination of a defendant who takes the witness stand is well stated in State v. McTague, 190 Minn. 449, 252 N. W. 446. See also State v. Tsiolis, 202 Minn. 117, 277 N. W. 409.

Nor do we think error was committed in allowing the state to prove that defendant had not observed the conditions of his probation, one of which was to abstain from intoxicants and beer parlors. Nor do we find misconduct under defendant's point VI, covered by assignments of error Nos. 46 to 51, inclusive, justifying this court in holding that defendant was thereby deprived of a fair trial. As already stated, the court was very liberal to both sides in respect to cross-examination of witnesses, but within the range given there was no misconduct of the county attorney.

In this connection we include point X, wherein irregularity in the proceedings are urged as ground for a reversal. Certainly no complaint is to be made of the county attorney's objection to a question asked of defendant by his counsel in respect to correcting or explaining his answer that he had kept his probation, for the attorney withdrew the question. There surely was nothing savoring of irregularity in the cross-examination of Dr. Youbert T. Johnson when called as witness for defendant. Nor is the state to be criticized for placing Mrs. Cedarstrom on the stand. The jury, and neither this court nor the trial court, was to pass on the credibility or value of her testimony.

The trial court found no fault with the final address of the county attorney. Great weight is to be given the judgment of the trial court in that respect. However, we cannot approve of a prosecuting attorney referring to a defendant, who has taken the witness stand and revealed certain shortcomings or vices, as a hoodlum, defined in the dictionary as a young rowdy. It is not argument. Nor should the county attorney tell the jury what witness he believes or does not believe. Such talks to the jury have been repeatedly disapproved. 5 Dunnell, Minn. Dig. (2 ed. & Supps.) § 7102 (see note 69 thereunder); State v. Clark, 114 Minn. 342, 131 N. W. 369; State v. Peterson, 153 Minn. 310, 190 N. W. 345; State v. Boice, 157 Minn. 374, 196 N. W. 483. The decisions cited, such as People v. Black, 367 Ill. 209, 10 N. E. (2d) 801; Commonwealth v. Capalla, 322 Pa. 200, 185 A. 203; Thurman v. State, 85 Tex. Cr. R. 276, 211 S. W. 785; Swilley v. State, 114 Tex. Cr. R. 228, 25 S. W. (2d) 1098; Rodriguez v.

State, 135 Tex. Cr. R. 322, 119 S. W. (2d) 1048, accord with the rule in State v. Clark, 114 Minn. 342, 131 N. W. 369. However, in the instant case it is to be noted that even counsel for defendant did not find fault with the county attorney's argument at the time it was delivered, except as to some inconsequential matters not meriting even criticism. Moreover, the address is not comparable in denunciations with those used in the cases above cited and on account of which a new trial was granted. It is also to be observed that in every case cited objections were made to the improper argument at the time it was made and the court requested to rebuke the prosecuting attorney and instruct the jury to disregard it. Nothing of that sort occurred here.

As to point V, covered by assignments of error Nos. 30 to 33 and 43 and 54, relating to evidence in respect to defendant's probation, after that matter was brought into the case by defendant, there was nothing improper in disproving his testimony in that respect. In fact, on cross-examination he admitted he procured his release from probation by falsehood.

Point VII claims error in permitting the state to call Minnie Staples and Rhea Krane in rebuttal to testify that Bernice, in conversations with them, made statements concerning her knowledge of her assailant contradictory to the statements testified to by defendant's witness Mrs. Murphy that Bernice made to her. Such "rehabilitation" of Bernice's testimony is permissible under the rule in State v. Taran, 176 Minn. 175, 222 N. W. 906.

The only disturbing feature in this record is the court's memorandum to the order denying a new trial, which, after reviewing the evidence as to whether it sustained the verdict, concludes that it does, then ends with these three sentences:

"In a sense, the work of the trial court is ended. I cannot help feeling, however, that the case should never be considered closed, by the authorities of this county, until such time as something more convincing than we have yet had comes to light. This remark should not be construed to affect the decision of the court as made on this motion; but for one who has heard the testimony

from beginning to end, there is a natural desire to know the truth beyond the shadow of a doubt."

We cannot interpret this other than that the trial court considered that defendant was proved guilty beyond a reasonable doubt, but that it would have been more satisfactory if even the shadow of a doubt were removed. Of course that would be desirable in every criminal case, but is seldom attainable. The law leaves the responsibility to a jury to determine whether a defendant has been proved guilty beyond a reasonable doubt.

The order and judgment are affirmed.

