## STATE v. ARTHUR F. CLOW.[1]

June 11, 1943.

No. 33,493.

[1]Reported in 10 N. W. (2d) 359.

*Richard Converse,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Ralph A. Stone,* Assistant Attorney General, and *William P. Sturtz,* County Attorney, for the State.

YOUNGDAHL, JUSTICE.

Defendant was convicted of the offense of criminal negligence in the operation of his automobile in such a manner as to cause the death of one Mildred Davis Valencich, in violation of Minn. St. 1941, § 169.11 (Mason St. 1940 Supp. § 2720-175).

On the evening of May 1, 1942, defendant and decedent were returning in defendant's Oldsmobile coupé to Albert Lea, Minnesota, from Mason City, Iowa, on state highway No. 69. Traffic approaching Albert Lea from this direction on No. 69 travels in a northeasterly direction. A few miles southwest of Albert Lea, however, No. 69 meets and forms a junction or wye with state highway No. 16, which runs in an easterly and westerly direction. Northbound traffic going to Albert Lea takes the right-hand or east fork of the road onto No. 16, while travel to Blue Earth, Minnesota, and other points in the opposite direction, takes the left-hand or west fork of the road onto No. 16. No. 69 is 22 feet wide with a nine-foot shoulder, ditched on each side, and paved, with the exception of approximately the last 300 feet approaching the junction from the southwest. This portion has a 40-foot roadway of gravel and oil,

referred to as "black top." No. 16, which is about 20 feet wide, is completely paved at the point where each fork of No. 69 meets it at an angle of approximately 45 degrees.

Approaching this junction on No. 69 from the southwest and within a reasonable distance therefrom are a number of highway traffic signs, such as *"Speed 40 Limit," "Speed 30 Limit," "Pavement Ends," "Tractors with Lugs Prohibited," "Junction U. S. 16," "Stop Sign Ahead,"* and, at the junction, a *"Through* STOP *Highway"* sign. There are also advertising billboards and a sign in the wye pointing to the west for Blue Earth and to the east for Albert Lea.

It appears that the purpose of the trip to Mason City was to accommodate a mutual acquaintance of defendant and decedent who desired to drive there. The parties arrived shortly before 5:00 p. m. in the evening. After delivering their passenger, defendant and decedent "loafed" around town for a few minutes and defendant purchased a pint of whiskey and two "fifths" of wine, one each of a red and white type. They then drove out of Mason City for a few miles and back again for dinner. They each sampled the white wine, but it was distasteful to decedent. This bottle was then capped and placed behind the automobile seat. The red wine was opened, and defendant states that he removed about one-third of the contents of the bottle into another container and this portion was taken into an inn, mixed with Coca Cola, and consumed before dinner. They left the inn about 9:30 p. m., stopped en route home at two public places which provided dancing for entertainment, and departed from the last of the two at approximately 10:30 that evening. It was misting at intervals and the pavement was damp, necessitating intermittent use of the windshield wiper. Shortly after midnight they approached the junction of highways 69 and 16, intending to take the right-hand or east fork of the road to Albert Lea. The driver obviously lost control of the machine, which proceeded across the road, into the ditch on the north side of No. 69, turned over, and came to rest with the front facing southwest, the opposite direction from which it had been traveling, and lying

against the embankment on the left or driver's side. The vehicle traveled 111 feet along the ditch from the point where it left the pavement before turning over and thereafter some 20 feet before coming to a stop. There were no eyewitnesses to the accident. One Nelson, who arrived at the scene shortly thereafter, was attracted by the lights of defendant's car in the ditch and the sound of the horn blowing. Upon reaching the car, Nelson found defendant inside the car and decedent, yet alive, helplessly pinned under it on the left or driver's side. The windshield, as well as the glass in the left door, was shattered. With some assistance, Nelson righted the vehicle, placed decedent in his automobile and, together with defendant, drove to a hospital in Albert Lea, where decedent succumbed to her injuries some 22 hours later.

Although defendant told witness Nelson that he was driving between 35 and 45 miles per hour at the time of the accident and made similar admissions the following day to members of the state highway patrol and county police officers, who later testified at the trial, his defense at the trial was that decedent was driving and had been for a few miles. Defendant testified that he had stopped his car alongside the highway, went to the rear of the vehicle, and, upon returning, found decedent behind the wheel, intending to drive, which he permitted her to do; that upon reaching the junction an automobile was approaching on the left fork from the direction of Blue Earth with bright headlights, which momentarily blinded them; that he was aware of decedent's inability to execute a right-hand turn and told her to "take the ditch." Defendant contends that she did this, with the accident resulting. It appears that decedent did not have a driver's license and was unaccustomed to driving. Knowing these facts, defendant testified that when decedent started to drive his car he admonished her, "all right, keed, if anything happens, I am driving." Defendant offers this in explanation of statements made by decedent shortly before death to the effect that he was driving at the time of the accident. Defendant explains his own admissions that he was driving and his approximate speed, first, to the initial shock of the accident and, later, to the

sedative effects of opiates administered the following morning by his physician to alleviate the pain from injuries sustained. His attending physician testified that defendant was "mentally confused" and that "his answers were not coherent" as a result of his pain and the sedatives prescribed therefor. In the debris found about the wrecked vehicle was one bottle of white wine behind the seat of the car. This bottle was capped and practically full. The other bottle of red wine was lying under the clutch pedal, uncapped and only partially full. Other pieces of glass, vaguely identified, were strewn about the wreckage. Defendant stated at the trial that he had removed the bottle of red wine from the glove compartment, taken off the cap, and was about to take a "sip" as they approached the junction of Nos. 16 and 69, and that he apparently dropped it on the floor at the time of the accident. He testified further that the pint of whiskey was unopened and that he had it at home. It was not offered in evidence at the trial. There was other testimony to the effect that defendant stated that he had been "sipping" wine that evening. On rebuttal, the state offered other statements made by decedent to the effect that there had been "some drinking" and her denial that any automobile approached from the east as they entered the junction on the night in question.

Defendant assigns as error (1) that the verdict is not justified by the evidence, in that the evidence is insufficient to sustain a finding (a) that defendant was driving the car at the time of the accident, and (b) that the driver of the car was guilty of criminal negligence; (2) that the court erred in permitting the state, on defendant's cross-examination, for the purpose of impairing his credibility, to show that he had been twice married and divorced and which of the parties obtained the decrees; (3) misconduct of the court in discussing or commenting upon the evidence in the presence of the jury while taking a view of the *locus in quo*.

We consider defendant's assignments of error in inverse order, since a disposition of this appeal on an alleged error of law occurring at the trial obviates the necessity of considering those errors relating to the sufficiency of the evidence to sustain the verdict.

■ Defendant claims misconduct on the part of the trial court in discussing or commenting upon the evidence in the presence of the jury while taking a view of the *locus in quo*. Prior to viewing the premises, the court instructed the jurors as follows:

"\* \* \* You are instructed that in taking this view, it is not for the purpose of obtaining evidence; it is for the purpose of better understanding the evidence, given you by the witnesses in the court-room. During the trip and the inspection, it is far better to not make any remarks or discuss the case in any manner. Go there to see, to look, and observe, but not to discuss. The case should be discussed by the jurors in the jury room only. Ask as few questions as possible. *The court will accompany you, and with as little comment as possible direct your attention to the signs and road, and marks that have been testified to in the case.*" (Italics supplied.)

It does not appear that a reporter was present to record what was said by the court. In State v. Rogers, 145 Minn. 303, 309, 177 N. W. 358, 360, while it was held that the defendant's constitutional right to be confronted with the witnesses against him was not violated by permitting the jury to view the premises in his absence, this court placed certain restrictions upon the manner of conducting a view in this language:

"On such a view care must be taken to see that the jury receive no information other than that obtained by looking over the premises, and any explanations deemed desirable by either party should be made by witnesses sworn and examined in open court in the court room."

The Supreme Court of the United States in Snyder v. Massachusetts, 291 U. S. 97, 54 S. Ct. 330, 78 L. ed. 674, 90 A. L. R. 575, passed upon the question whether a defendant's constitutional rights were violated by a view of the *locus in quo* in his absence. By a five-to-four decision, the court held that a view under those conditions was not in itself violative of the due process clause; that, while

pointing out specific objects to be observed was not objectionable, the trial court was to be criticized for stating that one of the objects was not there at the time of the homicide, since this went beyond the bounds of explanation appropriate for showers. The court indicated that if the showers failed to point out anything material, defendant might prove the fact upon the trial if he had the benefit of a stenographic transcript of all that was said and done at the view. In the instant case there was no stenographic record for defendant to inspect. We do not doubt that the court exercised care and caution in pointing out objects, if any were so identified, and in the remarks he made. The error, however, is in the fact that defendant had no way of knowing what was said. Though the court in a criminal case may point out and identify objects at the *locus in quo* to better enable the jury to understand the testimony, yet, if such is done, it is error not to provide a transcript of the proceedings for defendant's benefit and protection. Snyder v. Massachusetts, 291 U. S. 97, 54 S. Ct. 330, 78 L. ed. 674, 90 A. L. R. 575. It does not suffice to suggest that the record fails to show prejudice, since it does not appear what, if anything, was said by the court. To argue that, because the record is silent as to what was said, therefore no prejudice appears is to beg the constitutional question. The substance of defendant's right is to know what transpired during the viewing. The guaranty of the constitutional rights of an accused is not tested exclusively by the result, but also by the manner in which such result was reached. The requirement of due process under the constitution is not satisfied if the hearing was unfair, though the end might be just. Patton v. United States, 281 U. S. 276, 50 S. Ct. 253, 74 L. ed. 854, 70 A. L. R. 263.

We conclude, therefore, that defendant's constitutional rights have been violated by the failure to provide a stenographic transcript of the proceedings at the time of viewing the *locus in quo,* and as a result thereof defendant is entitled to a new trial.

In view of the necessity of another trial, we feel it our duty to call attention to the ruling on evidence during defendant's cross-

examination. The following questions were asked him:

"Q. Who got the divorce, you or your wife?

"Mr. Ostrander: That's immaterial. Object to that on the ground it is incompetent—

"The Court: Overruled. It is admissible as affecting credibility.

"Q. Who got the divorce, you or your wives?

"A. I think I played the part of a gentleman and let my wife get the divorce.

"Q. In both cases your wife got the divorce against you?

"A. That is my remembrance, yes."

Although objection was made to this line of questioning, no exception was taken thereto. In the motion for a new trial defendant made a general assignment of "errors of law occurring on the trial" without specifying the particular errors claimed. Under such circumstances, it is not properly here for review. This court has held that in both civil and criminal cases, where no exception was taken at the trial or where the error is not clearly specified in the motion for a new trial, it is not properly here for review. 5 Dunnell, Dig. & Supp. § 7091; 6 *Id.* § 9724; Clark v. Warner, 193 Minn. 564, 259 N. W. 62; State v. Jatal, 152 Minn. 262, 188 N. W. 284; Leifson v. Henning, 210 Minn. 311, 298 N. W. 41. Inasmuch as the question will undoubtedly arise at the next trial, we wish to make our position clear that this evidence should not have been received. We fail to see any relevancy between the fact that defendant's former wives obtained divorces from him and his credibility as a witness. We appreciate that we have gone quite far in State v. Tsiolis, 202 Minn. 117, 277 N. W. 409, and State v. McTague, 190 Minn. 449, 252 N. W. 446, in approving cross-examination of a defendant in a criminal case and permitting inquiry into his family history. Although ordinarily the extent of cross-examination is within the discretion of the trial court, there is a limit beyond which questioning should not proceed, and in our opinion it went beyond reasonable limits in the instant case. See 3 Wigmore, Evidence (3 ed.) §§ 983, 984. Moreover, where, as here, the evidence

relied upon by the state was largely circumstantial, prejudice is more likely to arise in the admission of this type of testimony.

■ Defendant objects to the admission of testimony relating to the conversations between decedent and an officer, given at the hospital about 11 hours after the accident. He asserts that this was hearsay and clearly prejudicial to him. He concedes that, inasmuch as no objection was made at the trial, he is in no position to complain on this appeal. Although this error of law is not properly before us, since no objection was made to its reception, inasmuch as this issue will, in all probability, arise at the next trial, we feel it our duty to make appropriate comment now. The state urges that these conversations are a part of the *res gestae* and therefore an exception to the hearsay rule. Defendant counters with the contention that they were not spontaneous remarks and were too remote from the time of the accident to be considered a part of the *res gestae*. Upon questioning by the officers some 11 hours after the accident, decedent stated that defendant was driving the automobile and that she observed no other automobile with blinding lights which caused defendant's automobile to go into the ditch. Some discretion is allowed the trial court in admitting testimony under this rule, and there is no arbitrary time limit. It is necessary, however, that the utterances be spontaneous and not too far removed in point of time from the happening under consideration. In the instant case, the statements made by decedent were in answer to questions propounded to her and could not be considered as spontaneous under any circumstances. Clark v. Davis, 153 Minn. 143, 190 N. W. 45; 2 Dunnell, Dig. & Supp. §§ 3300 and 3301, and cases there cited.

Reversed with directions for new trial.

Mr. CHIEF JUSTICE HENRY M. GALLAGHER took no part in the consideration or decision of this case.