**STATE of Maine**

v.

**James Pearly GERVAIS.**

Supreme Judicial Court of Maine.

April 9, 1974.

Peter G. Ballou, Asst. County Atty., Arthur A. Stilphen, Asst. Atty. Gen., Portland, for plaintiff.

Daniel G. Lilley, Portland, for defendant.

Before DUFRESNE, C. J., and WEBBER, WEATHERBEE, WERNICK and ARCHIBALD, JJ.

DUFRESNE, Chief Justice.

On October 23, 1971 James P. Gervais, the defendant, was convicted by a Cumberland County jury of the crime of assault with intent to kill while armed with a dangerous weapon, in violation of 17 M.R.S.A., § 2656,[1] the victim of the assault being one Harold Sargent. Sentenced to a term in Maine State Prison of not less than 5 years and not more than 20 years, the defendant appealed from the judgment, raising a number of issues wherein he claims the lower Court committed error. Only two of the defendant's points on appeal were briefed and argued to this Court. The assignments of error not briefed nor argued are considered abandoned or waived. State v. Warner, 1967, Me., 237 A.2d 150; State v. Alley, 1970, Me., 263 A.2d 66; State v. Wilbur, 1971, Me., 278 A.2d 139. After consideration of the points properly before us, we deny the appeal.

On the evening of December 10, 1970 Harold Sargent, while patronizing the Cameo Lounge in Portland, Maine, was shot twice in the chest with a .25 caliber handgun. Both Mr. Sargent and one Roger Rivard at trial identified Gervais as the person who pulled the trigger.

In order to appreciate at their full value the grounds of appeal upon which the defendant relies for a reversal of his conviction, a recitation of the facts as presented by this record would be advantageous.

The evidence establishes that the shooting took place at approximately eleven o'clock as Sargent was returning from the dance floor toward the seat he had been

---

1. The statute at the time of the commission of the offense, to wit, on December 10, 1970, which controls in the instant case, read in pertinent part as follows:

"Whoever assaults another with intent to murder or kill, if armed with a dangerous weapon, shall be punished by imprisonment for not less than one year nor more than 20 years; when not so armed, . . . ."

The Legislature in 1971 (Public Laws, 1971, c. 539, § 16) increased the punitive sanctions for this type of crime by providing as follows:

"Whoever assaults another with intent to murder or kill, if armed with a dangerous weapon, shall be punished by imprisonment for not less than 2 nor more than 25 years. The imposition or execution of such sentence shall not be suspended and probation shall not be granted. Whoever . . . ."

occupying in company of some friends. According to his version at trial, he was within four or five feet of the defendant, who was seated at a table, when someone bumped against him. Raising his hand in a gesture of apology, he then heard shots and felt bullets entering his body. Staring the defendant in the face for several seconds, so he testified, he then saw a silver gun in the defendant's hand. He denied any conversation with Gervais and positively contradicted Rivard's testimony that he, Sargent, had given the defendant "the finger." Clutching his stomach, Sargent was said to have walked unsteadily to his table, where he sat down, told his friends he had been shot and within seconds fell to the floor where a person in his party administered first aid.

Rivard, a completely disinterested witness, testified somewhat differently from what Sargent stated on the witness stand. He said that he was sitting at a table behind that at which the defendant was seated and observed the whole incident. He further indicated that the table at which Gervais was then sitting alone was nearest the bandstand. He observed Sargent walking toward the defendant's table where he claims words were exchanged between the two men. As he asserted, although he could not hear what was being said, he could see the movement of their lips. Sargent, he told the jury, held up his hand and twice gave Gervais "the finger", which Rivard described as raising the hand and extending the middlefinger in the direction of the defendant. After Gervais reciprocated in kind, Rivard heard the shots and saw two flashes of light near the defendant's right hand. He did not see the gun, nor did he notice that the defendant's right hand was bandaged. Sargent's subsequent collapse caused Rivard to watch Gervais' movements more closely thereafter and he followed his immediate departure from the lounge to a station wagon where he noticed the defendant crouching beside the vehicle. He saw him leave in a Volkswagen in the company of another person.

It is undisputed that the defendant, at the time of the shooting, was in the Cameo Lounge with friends, amongst whom was one William Culliton, who, defense witnesses asserted, was seated near Gervais. Witnesses confirmed the fact that the defendant approached the station wagon where he stood crouched by the front fender of the car. Culliton picked up Gervais at that point in a red Volkswagen, and several hours later both were stopped at an entrance of the Maine Turnpike in Portland and arrested. At the time of arrest the defendant was wearing blue and white striped pants, which had a tear in the crotch, and a grey or blue turtleneck sweater, while Culliton's dress consisted of pink pants and a pink floral shirt. Both were approximately of the same height and build with somewhat different color of hair.

The evidence further revealed that the gun involved in the assault was later that night found by the investigating officers buried in the snow near the front tire of the station wagon near the point where the defendant had earlier been standing.

Rivard at trial identified the defendant as a person with whom he attended high school several years before. He thought, however, that the defendant, at the time of the shooting, was wearing the pink pants which, he was sure, were split in the crotch.

Sargent, on the other hand, told his treating physician at the hospital that he did not know the person who shot him nor could he clearly identify his assailant's facial features.

Gervais at trial became a witness for himself and denied the shooting, claiming that his only involvement was in helping Culliton to escape. He testified that he saw Culliton shoot Sargent. He admitted crouching near the headlights of the station wagon, explaining that he wanted to see if they were burning as he had had a previous wiring problem with the car. Although he tried to leave in the station

wagon, he could not start it. The police confirmed that the car was not operable.

A former girl friend of Culliton, who expressed dislike for the defendant, told the jury that a few days following the event, Gervais admitted to her that he had shot Sargent, but in self-defense.

No eye-witness, except the defendant, testified to the effect that Culliton was the person who fired the gun, but there was some testimony that Culliton was seen both on the evening of the incident and prior thereto with a gun similar to the weapon used in this assault.

Resolving the conflicts and inconsistencies in the testimony, whether in one witness or among the witnesses, as they had a right to do,[2] the jurors, in viewing the evidence in all its aspects, were convinced to a unanimity beyond a reasonable doubt that the defendant was guilty of the crime of assault with intent to kill while armed with a dangerous weapon as charged.

## I  ADMISSION OF CONVICTION OF CRIME PENDING ON APPEAL.

The defendant claims that, with the conflict that existed in the evidence, the jury would not have found him guilty, if the Justice below had not permitted evidence of a recent conviction of assault of a high and aggravated nature to be given to the jury over his objections. Recognizing that, pursuant to 16 M.R.S.A., § 56,[3] a conviction of the crime of assault of a high and aggravated nature, a felony, was admissible to affect the defendant's credibility as a witness, nevertheless, the defendant asserts that, where that conviction was not a final judgment since it was then on appeal to the Law Court, its disclosure to the jury was without the sanction of the stat-

ute and prejudicial error requiring a reversal. We disagree.

The defendant at trial offered himself as a witness in his behalf. By so doing, he placed his general character for truth and veracity on the line and must needs be prepared to meet any proper evidence of prior convictions of any of the crimes specified in 16 M.R.S.A., § 56. These prior convictions are then matters properly in issue for impeachment purposes. See, State v. Carson, 1876, 66 Me. 116; State v. Watson, 1876, 65 Me. 74. Conviction of crime for the purpose of affecting the credibility of a defendant who has offered himself as a witness need not necessarily be proved by the record alone; it may be elicited in cross-examination of the accused. State v. Knowles, 1904, 98 Me. 429, 57 A. 588. And the prosecution is not bound by the witness's answer, if it be in the negative or less than the whole truth. See, State v. Toppi, 1971, Me., 275 A.2d 805.

The defendant obviously believed that his prior convictions of crime would have less impact on the jury if he himself volunteered the information in his direct examination. Defense counsel implemented such trial tactic by proceeding with the following examination of the accused.

"Q. Let me ask you, Mr. Gervais, whether or not you have been in trouble with the law before?

"A. Yes, I have.

"Q. Did you get involved in an incident in Lewiston a few years back, on a conviction basis I am now talking about, where you were charged and convicted of breaking, entering and larceny?

"A. Yes, I was.

2. State v. Fournier, 1970, Me., 267 A.2d 638, at 641.

3. 16 M.R.S.A., § 56, at the time of the offense and trial, provided as follows:

"No person is incompetent to testify in any court or legal proceeding in consequence of having been convicted of an offense, but conviction of a felony, any larceny or any other crime involving moral turpitude may be shown to affect his credibility."

"Q. And that was involving a high school situation?

"A. Me and another kid broke into a high school.

"Q. And have you also been subsequently in trouble on one other occasion involved with a store of some kind in which you left the store without paying for an item?

"A. Yes.

"Q. And is that the extent of your involvement with the law? And this case here pending against you? And this other occasion, this breaking, entering which occurred when you were nineteen, is that right?

"A. Yes.

"Q. And you are now twenty-four?

"A. Almost twenty-four, next month."

We believe that this meticulous examination of the defendant by his attorney was for the very purpose of minimizing the effect of his prior convictions on his credibility; undoubtedly, counsel felt that Gervais' version of the incident, his denial of the shooting and his accusation of Culliton as being the guilty party would be more acceptable to the jury, if they could conclude that Gervais had grown up from a 19 year old prankster to a law abiding citizen of twenty-four.

Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege does not justify his giving perjurious testimony. Having voluntarily taken the stand, the defendant was under an obligation to speak truthfully and accurately, and the prosecution on cross-examination, on this occasion, did no

more than utilize the traditional truth-testing devices of the adversary process. See, Harris v. New York, 1971, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1; Walder v. United States, 1954, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503.

It is difficult to perceive why the legitimate effect of the defendant's distorted picture of his past brushes with the law should not be allowed to be counteracted by shedding a true light upon the defendant's total criminal involvement. See, Prentiss v. Roberts, 1861, 49 Me. 127. Cross-examination of an accused who has testified in his own behalf may be directed to the eliciting of any matter which may tend to overcome or qualify the effect of the testimony given by him on his direct examination. People v. Zerillo, 1950, 36 Cal.2d 222, 227, 223 P.2d 223.

In State v. Smith, 1950, 54 N.M. 170, 216 P.2d 921, where the accused had denied on direct examination having been in *any more trouble* since 1937, the prosecution was allowed over objection to introduce two arrests for drunkenness since 1938, the Court explaining:

"We believe that the question propounded to the appellant by his attorney on direct examination was for the purpose of showing that he had been a law-abiding person since his former convictions and free of brushes with the officers of the law, and, therefore, the question asked on cross-examination was proper." [4]

■ How far the cross-examination of a witness, including the defendant, may go to remain within the bounds of sound judicial discretion is largely a question for the presiding Justice to decide. On review, we look only to see whether or not there was any abuse of discretion. International Pa-

4. For cases of similar import, see, Skaggs v. State, 1973, Ind., 293 N.E.2d 781, at 785; Harmon v. Commonwealth, 1971, 212 Va. 442, 185 S.E.2d 48; Martin v. United States, 1968, 10 Cir., 404 F.2d 640; People v. Baker, 1967, 7 Mich.App. 7, 151 N.W.2d 217; United States v. Nelson, 1960, 7 Cir., 273 F.2d 459; Brommer v. United States, 1960, D.C.App., 157 A.2d 292; State v. Palmer, 1939, 206 Minn. 185, 288 N.W. 160.

per Company v. State, 1968, Me., 248 A.2d 749. See also, State v. Lizotte, 1969, Me., 249 A.2d 874; State v. Biddison, 1963, 159 Me. 475, 195 A.2d 532. This record does not support any abuse of discretion.

Under the peculiar facts of this case, that the defendant was convicted of the crime of assault of a high and aggravated nature subsequent to his two previous convictions the disclosure of which he had volunteered in his direct examination, was relevant evidence on cross-examination to counteract the defendant's false statement that he had had no further trouble with the law. And it mattered not, whether such conviction was final or otherwise.

Nothing in this opinion is intended to intimate the views of this Court concerning the admissibility, for purposes of impeachment, of a conviction which is not final and is under appeal, where such testimonial inquiry into a defendant's prior criminal record is initiated by the State on cross-examination, and the defendant has not opened up the question in the presentation of his case in chief.

## II DEFENDANT'S CLAIM OF ERROR IN ALLEGED REFUSAL TO PERMIT A DEFENSE WITNESS TO TESTIFY TO A THIRD PARTY'S EXTRAJUDICIAL STATEMENT ADMITTING THE CRIME.

The defendant at trial, in his direct examination of one Michael Morris, sought to introduce in evidence a conversation which William Culliton [deceased at the time of trial] allegedly had with Morris in his presence sometime in January or February following the shooting incident at the Cameo Lounge on December 10, 1970. The State objected to this evidence on the ground that it was hearsay. From the colloquy between the presiding Justice and the defendant's attorney in the absence of the jury, the offer of proof submitted to the Court to support the admissibility of the proffered evidence consisted of the following assertions. Morris would testify that William Culliton was then trying to sell him a hi-fi or stereo set in order to raise money to enable him to get out of the State, and would quote Culliton as saying to him in connection therewith: "You know I am in trouble with the law, I shot Sargent."

In dealing with this offer of proof, the Court made the following comment:

"In opening a logical door to an exception to the hearsay exclusion for this type of evidence, the Court must make certain that safeguards against misuse are also worked into the policy regarding the use of such evidence. To allow persons in close connection with one another where there is evidence of drug usage, and on at least one occasion it is alleged irrational behavior on the part of the deceased declarant from the use of drugs seems to the Court, seems to this Court to leave inadequate foundation for safeguarding of this type of exception to the hearsay rule. *The evidence is accordingly excluded unless suitable foundation for its submission can be laid.* [Emphasis added.] As a corollary, if the proffered evidence were to be admitted by the Court, the State contends that such an admission on common principle of fairness in prosecution would require the admission of Culliton's exculpatory statement given to the police on the night or early morning following the offense now in issue.

[Defendant's counsel]: "So that I understand the Court's ruling, if we qualified or laid a necessary foundation to qualify under the rule of admission against penal interest of the deceased, necessary foundation being mainly evidence not under the influence of drugs.

[The Court]: "Not only that, but not in the presence of the person now on trial and not having connection. *What about his voluntariness?* [Emphasis additional.]

\* \* \* \* \* \*

[Defendant's counsel]: "If we could possibly lay a foundation to get in declaration against penal interest, the Court would suggest the State would have the right to get in self-serving statements?

[The Court]: *"Inconsistent statements by the same person.* [Emphasis provided.]

[Defendant's counsel]: "I would think that probably at the time of the statement, at least Mr. Culliton was aware there was a substantial difference as to whether he pulled the trigger or whether he was there. On that ruling the Court has made, then again we will have to choose to shut off any further questioning of this witness not on the basis that we can't lay a foundation, because frankly I think we could, but on the basis that we feel there would be a substantial disadvantage to our going through the admission against interest and then having this long four, five page colloquy between Mr. Culliton and the police officer get into evidence. We don't feel that is admissible. We object to the ruling but because of the ruling we will shut off that part of our defense, and we will not inquire any more into Mr. Morris' testimony into this statement because of the Court's ruling."

Thus, the Court was not excluding Culliton's out-of-court self-incriminating statement that he had shot Sargent absolutely, but only de bene. As part and parcel of the exclusion, the Court was offering the defendant the opportunity to prove that Culliton made the statement knowingly, i. e. while he was not under the influence of drugs, and voluntarily, i. e. while he was not under coercion from Gervais. Also, the Court was advising defendant's counsel that if this later Culliton statement were admitted in evidence, Culliton's previous inconsistent statement given to the police which exculpated him in the incident would then become admissible. For strategical considerations, defendant's counsel rejected the proffered opportunity to lay the foundation for the admissibility of Culliton's statement against his penal interest, since, as counsel stated, "there would be a substantial disadvantage to our going through the admission against interest and then having this long four, five page colloquy between Mr. Culliton and the police officer get into evidence." Not only did the defendant fail to make any specific offer of proof relating to the circumstances under which Culliton's statement was made to Morris tending to establish its willfulness and voluntariness, but Culliton's previous statement to the police which defendant's counsel characterized as self-serving and inadmissible, although marked as an exhibit in the case, was not designated by the defendant for reproduction as part of the record on appeal, so that this Court could pass upon its admissibility as evidence. Under such circumstances, defendant's claim of error is ill founded.

■ In State v. O'Clair, 1972, Me., 292 A.2d 186, we left open the question whether the rule which justifies the admission of declarations against interest as an exception to the hearsay rule should be extended to declarations against one's penal interest to the same extent as declarations against pecuniary and proprietary interests. We did indicate, however, that, although the general rule in this country was against the admissibility of such statements, the modern trend was towards the recognition that a declaration against one's penal interest carried sufficient elements of trustworthiness to make it admissible in evidence. Most courts which have adopted the modern view have circumscribed the admissibility of such declarations with certain specific safeguards; this protects the State interest while at the same time essential justice and common fairness are afforded the accused. A rule which made every declaration against penal interest admissible in evidence under any and all circumstances could seriously handicap the administration of justice. Such a rule would open the door to defendants to produce

perjured and fraudulent "confessions" by others who, for some reason or other, have absconded or are otherwise unavailable as witnesses. State v. Larsen, 1966, 91 Idaho 42, 415 P.2d 685.

Even if we assume, as the defendant's counsel argues, that Culliton's statement to Morris was admissible as a declaration against penal interest, a question upon which we intimate no opinion, the defendant's claim that the Justice below committed reversible error when he ruled that, if the Culliton-to-Morris confession were admitted in evidence, then the Culliton-to-the-police exculpatory statement would become admissible, is without merit.

■ Passing the point whether the defendant has failed to protect his record by making Culliton's statement to the police a part of the material to be considered on appeal, even though the same was excluded from the evidence when the State moved for its admission in its counter-offer of proof, we hold that Culliton's exculpatory statement to the police, as the presiding Justice advised, would have been admissible as rebuttal evidence tending to dispute or minimize the effect of the inculpatory declaration to Morris. State v. Sanders, 1972, 27 Utah 2d 354, 496 P.2d 270; People v. Gonzales, 1967, 253 Cal.App.2d 502, 61 Cal.Rptr. 256; Dyson v. State, 1965, 238 Md. 398, 209 A.2d 609.

We conclude that all the circumstances surrounding Culliton's inculpatory admission to Morris should have been properly presented to the Justice below either by an adequate offer of proof or by the presentation of evidence in relation thereto in the absence of the jury.

In Mason v. United States, 1958, 10 Cir., 257 F.2d 359, cert. denied, 358 U.S. 831, 79 S.Ct. 52, 3 L.Ed.2d 69, where there was no showing that the statement, if made was voluntary and against the penal interest of the declarant, the Court said:

"If the appellant had reason to believe that an exculpatory statement was volun-

tarily made against the penal interest of the declarant, it was incumbent upon him to request the court to conduct an appropriate inquiry in the absence of the jury to determine admissibility."

"To what extent a confession or admission of a third party is free of collusion and bears the indicia of trustworthiness is a question which we think should be entrusted in the first instance to the sound discretion of the trial judge." Brady v. State, 1961, 226 Md. 422, 174 A.2d 167.

■ When an objection is made, the party producing the witness must make an offer of proof so that the trial court may be *fully advised* as to the relevancy and admissibility of the proposed testimony. Isenhour v. Speece, 1958, 238 Ind. 293, 150 N.E.2d 749.

■ In the instant case, it is apparent that the presiding Justice was not excluding the proffered evidence definitely and absolutely. He merely, in his discretion, excluded it for the time being, until the proper basis was laid showing its admissibility. It was the defendant's duty, if he wished to press for its admission, to throw further light upon the circumstances surrounding Culliton's declaration to Morris that he had shot Sargent, especially concerning the mental and emotional condition under which the statement was made, so that the Court could, in the exercise of a sound judicial discretion, determine whether this alleged declaration against penal interest was made voluntarily and free from the influence of drugs. See, Hotchkiss v. Coal & Iron Company, 1911, 108 Me. 34, 78 A. 1108.

It does appear that the defense was faced with a serious problem of trial strategy. If it successfully laid the basis for the admissibility of Culliton's statement exculpating Gervais as required by the Court, then it was forewarned that Culliton's prior inconsistent statement exculpating himself and inculpating Gervais in the in-

cident in all probability would then become admissible on the State's motion. The defendant cannot now complain about a situation of his own choosing.

The entry will be

Appeal denied.

WEBBER, J., sat at argument, but retired before this opinion was adopted.

POMEROY, J., did not sit.

All Justices concurring.