**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Angel RUBIO–GONZALEZ,**
**Defendant-Appellant.**

**No. 81–1512**
**Summary Calendar.**

United States Court of Appeals,
Fifth Circuit.

May 6, 1982.

Nicasio Dimas, Jr., San Antonio, Tex., for defendant-appellant.

Sidney Powell, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before RUBIN, SAM D. JOHNSON and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

Appellant Rubio-Gonzalez appeals his conviction, following a jury trial, on both counts of a two-count indictment charging violations of 8 U.S.C.A. § 1324(a)(3).[1] The first count charged that on or about June 29, 1981, in Helotes, Texas, at D & B Materials Company, appellant, willfully and knowingly, did, and did attempt to, conceal, harbor and shield from detection Rodolfo Correa-Anaya, who, as appellant then knew, was an alien not duly admitted nor lawfully entitled to enter and reside in the United States. The second count was a duplication of the first except that it related to a different illegal alien, Felipe Torres-Cruz.

The evidence tended to show the following.[2] Acting on information received by their San Antonio office, four Immigration and Naturalization Service [INS] criminal investigators went to the D & B Materials Company premises in Helotes, Texas, on June 29, 1981, at approximately 1:30 p. m.

---

1. Section 1324(a)(3) provides in part:

   "(a) Any person ... who—

   " . . . .

   "(3) willfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation;

   " . . . .

   "any alien ... not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony .... *Provided, however,* That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring." [Emphasis supplied.]

2. The evidence consisted of the testimony of four immigration officers and the two illegal aliens named in the indictment, together with immigration records showing, *inter alia,* previous illegal entries from Mexico into the United States by appellant. The defense presented no evidence.

to determine if illegal aliens were employed there. Investigators Marroquin and Osborn drove an unmarked car bearing government license plates, and investigators Garcia and Vasquez drove an unmarked van having government license plates and containing a wire cage-like panel separating the driver's seat from the rest of the van. When the agents arrived at D & B Materials Company, they stopped both vehicles at a trailer that appeared to be the office. Garcia went inside to advise that the agents were there and to ask permission to check the employees to determine if they were aliens illegally in the United States. Vasquez waited outside for Garcia to return; Osborn and Marroquin remained in their car.

While waiting outside the trailer, Vasquez saw a man, later identified as the appellant, Angel Rubio-Gonzalez, arrive on a motorcycle and go in the trailer. Garcia also saw Rubio-Gonzalez enter the trailer, talk to one of the secretaries, and leave. When appellant came out of the trailer, Vasquez started talking to him about his motorcycle. During the conversation the agent determined that Rubio-Gonzalez was an employee, so he identified himself, displayed his badge and asked to see appellant's identification. Appellant produced documentation showing he was a resident alien.[3]

While waiting for Garcia to come out of the trailer, Marroquin and Osborn drove around the work area to see if there was another office. They saw several people working near a rock crusher, and parked and watched them at a distance for a few minutes, then drove back toward the trailer. As they neared the trailer, they observed Vasquez talking to appellant, who appeared to be putting his wallet back in his pocket and who thereafter got on his motorcycle and started driving toward the work area. When Marroquin and Osborn arrived, Vasquez told them appellant was an employee and a lawful resident alien. Marroquin and Osborn then decided to follow appellant, turned their car around, and

followed approximately 100 yards behind him as he rode his motorcycle toward the work area. Appellant drove to the bottom of the gravel mound near the rock crusher where two men, later identified as Correa-Anaya [Correa] and Torres-Cruz [Torres], were working, dropped his motorcycle and ran up the hill toward them. The agents observed him gesturing and apparently pointing in the agents' direction, whereupon the workers immediately dropped their tools and ran. The distance was too great for the agents to hear whether anything was said, but Correa and Torres testified that appellant said, in Spanish, "immigration" or "immigration is here." The agents then drove around the mound of gravel and caught Correa and Torres, and a third alien who had been in the vicinity, attempting to escape. Two other illegal aliens were apprehended running in various directions from the general area of the rock crusher. While the investigators were chasing the aliens, appellant got back on his motorcycle and drove toward the exit, but Marroquin stopped him.

The five aliens were put in the van. They asked that they be allowed to obtain their personal belongings, and directed the agents to the "barracks" where they had been living on the property. As the agents approached this building, two aliens ran out of it. The agents chased these men, but caught only one, appellant's brother. Each of the six aliens apprehended admitted that he was in the country illegally and had no claim to United States citizenship.

Correa and Torres each testified that he was born in Mexico and that he and his parents were Mexican citizens, that neither he nor his parents were United States citizens or had been legally admitted into the United States, and that on the occasion in question he was not legally in this country. Each was present in the country on this occasion by virtue of an illegal entry, and each had entered the United States by walking or swimming across the Rio Grande near Piedras Negras. Upon crossing, each

---

**3.** Later evidence showed that appellant achieved this status, following petition there-for, by virtue of being married to a United States citizen.

had traveled first to Spofford and then directly to Helotes, where they had been working ever since at the D & B Materials Company plant. Correa arrived in October 1980, Torres in late April 1981. While at the D & B Materials Company plant they spoke Spanish exclusively. Though another party was apparently the owner, each knew appellant as the foreman or "boss," and each had talked to him from time to time since their arrival, always in Spanish. Each was from the Mexican State of Guanajuato, Correa's hometown being Jerecauro, and Torres' being Aposeo El Grande. Correa testified he did not talk with appellant about his or appellant's hometown or state or his status in the United States. Torres' testimony did not reflect whether these subjects were mentioned when he talked with appellant. Each testified they knew appellant's brother while at the D & B Materials Company. Torres answered "yes" when asked "was he also an alien, like you." Correa said he knew the brother's hometown but did not know if he was illegally in the country. Correa and Torres testified that approximately ten illegal aliens were working at the plant at the time of their apprehension. Each testified that prior to appellant's warning to them they were unaware of the presence of the immigration officers, and that they ran in an attempt to escape from the immigration officers.

Immigration records indicated appellant had been ordered deported as an illegal alien in April 1971, and March 1972, that on the former occasion he asserted he had made three prior entries into the United States, that his parents were Mexican citizens, as was he, and that his hometown was Aposeo El Grande, in the state of Guanajuato, Mexico. These records showed he had previously illegally entered by wading across the river near Eagle Pass. The records concerning his prior deportations also showed that he claimed to be married to an American citizen who was petitioning on his behalf for him to be granted resident alien status, although he admitted also being, or having been, married to another woman in Guanajuato.

Appellant challenges the sufficiency of the evidence to support his conviction on several grounds.

He first contends that there is no evidence that his conduct formed any part of the process, chain of events or successive stages of smuggling the aliens into the United States. While appellant accurately characterizes the evidence as failing to show that he was in any way connected with the smuggling process, nevertheless we have held that section 1324(a)(3) is not so limited. *United States v. Cantu*, 557 F.2d 1173, 1180 (5th Cir. 1977), *cert. denied*, 434 U.S. 1063, 98 S.Ct. 1236, 55 L.Ed.2d 763 (1978); *United States v. Varkonyi*, 645 F.2d 453, 459 (5th Cir. 1981). *Accord United States v. Lopez*, 521 F.2d 437, 441 (2d Cir.), *cert. denied*, 423 U.S. 995, 96 S.Ct. 421, 46 L.Ed.2d 368 (1975); *United States v. Acosta De Evans*, 531 F.2d 428, 430 n. 4 (9th Cir.), *cert. denied*, 429 U.S. 836, 97 S.Ct. 103, 50 L.Ed.2d 101 (1976). Appellant recognizes that these authorities are contrary to his contentions in this regard, but requests that we reexamine *Cantu*. Even were we inclined to depart from *Cantu*, which we are not, we would nevertheless be bound by it, as one panel of this Court cannot overrule the prior decisions of another panel.[4]

Appellant next contends that the evidence is insufficient because there is no showing that he was aware that either Correa or Torres were illegal aliens. While the evidence in this regard is wholly circumstantial, we nevertheless believe that it is amply sufficient. As Judge Rubin remarked for this Court in *United States v. Richards*, 638 F.2d 765, 769 (5th Cir.), *cert. denied*, ·· U.S. ----, 102 S.Ct. 669, 70 L.Ed.2d 638 (1981), "[b]ecause no one has a window to a man's mind, knowledge must

---

4. Appellant also presented this contention below in his motion to dismiss the indictment. The contention is made on appeal, however, only in respect to the sufficiency of the evidence. Appellant makes no contentions on appeal respecting the indictment. Regardless of the form in which the contention is made, we hold that it is without merit.

often be proved by indirect evidence." Appellant was no stranger to immigration practices and procedures. He apparently had made five illegal entries, at least two of which were by wading across the Rio Grande near Eagle Pass, just as Correa and Torres had entered. He had the opportunity to become aware of the documentation required for aliens, as he carried such documentation, and had been through the process of gaining status as a legal resident alien. Further, Correa and Torres had been at the D & B Materials Company site for several months, had spoken with appellant, who was the "boss" or foreman there, and had spoken only in Spanish. Appellant spoke to them in Spanish. They were both from appellant's home state in Mexico, and Torres was from his hometown. Appellant's brother was also an illegal alien working at the site, and there were several other illegal aliens there.

Appellant urges that this is not sufficient to prove he knew that Correa and Torres were illegal aliens, citing *United States v. Karathanos*, 531 F.2d 26 (2d Cir. 1975), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976). Considering only the evidence outlined in the preceding paragraph, the case presented is perhaps comparable to that in *Karathanos*. We note the strong dissent in *Karathanos*, but need not decide whether to follow the rationale of that decision, which involved probable cause for a warrant, as in the case at bar there is other significant evidence of a kind not present in *Karathanos*. Almost immediately after Vasquez identified himself to appellant as an immigration officer, and in effect released appellant after he had displayed his identification as a lawful resident alien, appellant rode his motorcycle to the base of the hill, jumped off and ran up the hill to where Correa and Torres were, gesturing and telling them that "immigration" was there. Correa and Torres without hesitation dropped their tools and ran away, seeking to escape detection by the INS. Appellant then got back on his motorcycle and started to drive off the premises, until the INS waved him down. If appellant did not realize Correa and Torres were illegal

aliens, there would be no reason for him to take such precipitous action to inform them of the presence of immigration. No other explanation for such conduct is suggested by the evidence of record, nor by anything asserted in counsel's brief, nor can we conceive of any other reason for appellant's actions in this regard. For us to hold that this does not constitute evidence of knowledge on appellant's part would be to deny the right of a jury to apply their common sense and understanding of ordinary human behavior to the decision of cases brought before them.

■■ Appellant also claims that the evidence is insufficient because merely warning illegal aliens of the presence of immigration officers does not, he asserts, constitute either concealing or shielding from detection as denounced by section 1324(a)(3). We disagree. "Shield from detection" as used in the statute includes shielding from detection *as* being an illegal alien. *See Cantu*, 557 F.2d at 1175–76, 1180. Likewise, the statute denounces attempted, as well as successful, shielding from detection. The evidence authorized the jury to find that appellant warned Correa and Torres in an attempt to prevent their being detected as illegal aliens by alerting them to flee so they would not be apprehended and their identity and illegal status would hence not be determined. The suggestion that "shield from detection" implies any requirement that a physical barrier of some kind be involved was clearly repudiated in *Cantu*. Nor can we imply the requirement that a trick or artifice must be employed. Nothing in the statute, nor in the words "shield from detection," supports such a trick or artifice requirement. The evidence was sufficient to authorize the jury to find that appellant knowingly or willfully attempted to shield the illegal aliens Correa and Torres from detection by the INS.

■ Appellant further urges that the evidence is insufficient to show harboring or attempted harboring. We need not consider this contention as we have held that there is sufficient evidence to support a

conviction on the basis of attempted shielding from detection. Section 1324(a)(3) by its express terms may be violated in any one of several ways—by harboring, *or* by concealing, *or* by shielding from detection *or* by attempting to do any of these. To sustain a conviction it is not necessary that the accused be shown to have violated the act in all of the ways in which it could be violated. The fact that each count of the indictment alleged harboring, concealing, shielding from detection and attempting to do each, all in the conjunctive, does not change the result. Conviction may nevertheless rest on evidence showing any, though less than all, of these. *See Turner v. United States*, 396 U.S. 398, 90 S.Ct. 642, 654, 24 L.Ed.2d 610 (1970).

Appellant also complains of the trial court's charge to the jury defining "harboring" as meaning "any conduct tending to substantially facilitate an alien's remaining in the United States illegally." Appellant urges that this instruction is too broad, in that a proper definition should be limited both to actions comprising a part of the successive stages of the smuggling process, and to the provision of shelter or services. As stated above, we reject appellant's contention that subparagraph (3) is limited to activities which constitute a part of the successive stages of the smuggling process. The definition given in the charge comes from the opinions in *Cantu, Varkonyi*, and *Lopez*.

In this case the trial court also carefully instructed the jury concerning the employment proviso of section 1324(a) as well as the requirement that appellant not only knew that the alien named in each respective count of the indictment was in fact unlawfully in this country, but that also appellant's concealing, harboring or shielding from detection of such alien, or attempting to do so, was done "willfully or knowingly." In this connection, "knowingly" was defined as "voluntarily and intentionally and not because of a mistake or other innocent reason" and "willfully" was defined as "voluntarily and purposely with the specific intent to do something that the law forbids—that is to say, with a bad purpose either to disobey or to disregard the law." None of these instructions were in any way objected to.

Under the wording of the indictment and the evidence the *only* matter presented for the jury's consideration was whether Correa and Torres were illegal aliens, whether appellant knew this on the occasion in question, whether he warned them of the presence of the immigration officers under the circumstances testified to by the various witnesses, his state of mind in so doing, and whether such conduct and state of mind on his part amounted to a violation of subparagraph (3) of section 1324(a). The trial court's instructions adequately presented all these questions to the jury. The jury was not allowed to find appellant guilty on the basis of any conduct or any state of mind that would not constitute a violation of subparagraph (3). Under these circumstances, it matters not whether the particular conduct and state of mind at issue be labeled "harboring" or "concealing" or "shielding from detection," for each are equally violative of subparagraph (3). The trial court adequately instructed the jury on what was necessary to convict under section 1324(a)(3) and did not allow the jury to convict on the basis of any conduct not alleged in the indictment and shown in the evidence, or which would not constitute a violation of section 1324(a)(3). The instruction complained of does not present reversible error.[5]

5. We do not construe section 1324(a)(3) as constituting harboring, concealing and shielding from detection as different offenses, each separate and distinct from the other. Rather, we view it as proscribing a single offense which may be committed in different ways.

Section 1324(a) does define distinct crimes in its numbered subparagraphs (1), (2), (3) and (4). But within each of the individually numbered subparagraphs of section 1324(a) there is no such apparent attempt to create distinct and separate offenses. In subparagraph (3) "willfully or knowingly" applies to all conduct denounced therein, and attempts are also broadly proscribed. Our decisions have referred to subparagraph (3) as a unitary whole in describing it as a provision that "proscribes any conduct which tends to substantially facilitate an

Appellant's remaining contention is that the court erred in admitting the records showing his prior illegal entries into the United States in 1971 and 1972. No complaint was made at trial, nor is any made here, about the authentication of these records or the method of proof of the matters reflected thereby. Rather, appellant's complaint is that the facts shown were irrelevant and prejudicial, because they were remote in time, did not involve criminal acts, and did not involve acts that were similar to those charged in the instant case. We disagree.

■ We hold that these records were properly admitted for the limited purpose of showing appellant's knowledge and state of mind, which are clearly elements of the offense charged in each count. We note in passing that the trial court carefully considered the admissibility of these records in a hearing outside the presence of the jury, and concluded that the probative value of this evidence to show appellant's knowledge and state of mind was not outweighed by the dangers of unfair prejudice, confusion of issues, or misleading of the jury. The court carefully instructed the jury when the evidence was admitted, and again in the final charge, that they could consider the

evidence only if they first determined, independent of it, that appellant did the acts charged. Even then they could consider the evidence only insofar as it reflected on appellant's knowledge and state of mind on the occasion charged in the indictment. Appellant did not, and does not, complain of these instructions. Indeed, appellant's counsel was specifically asked whether he desired any further instructions in this regard, and he said he did not.

Under Rule 404(b) of the Federal Rules of Evidence, "[e]vidence of other crimes, wrongs, *or acts* [may be admitted] . . . as proof of motive, opportunity, *intent*, preparation, plan, *knowledge*, identity, or *absence of mistake* or accident." [Emphasis added.] Under Rule 403 relevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of issues or misleading of the jury. Plainly, the trial court properly appraised the issue of the admissibility of this evidence, and the limited purposes for which it could be considered, in accordance with Rules 403 and 404 and the decision of this Court in *United States v. Beechum*, 582 F.2d 898 (5th Cir. 1978) (en banc), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). In these circumstances the decision to admit the evidence can be

alien's remaining in the United States illegally." *Varkonyi*, 645 F.2d at 459. Similar general language, without distinction between "harbor" and "conceal" and "shield from detection" was used by this Court in *Cantu*, where the indictment charged only shielding from detection, and by the Second Circuit in *Lopez*, where the indictment appears to have alleged only "harboring."

We do not suggest that the words "harbor," "conceal" and "shield from detection" are synonymous, and we recognize that the employment proviso applies only to "harboring." *See Acosta De Evans*, 531 F.2d at 430 n. 3. But we do not believe that these considerations lead to the conclusion that three distinct and separate offenses are denounced in subparagraph (3). We believe that by referring to "harbor," "conceal" and "shield from detection" Congress intended to broadly proscribe any knowing or willful conduct fairly within any of these terms that tends to substantially facilitate an alien's remaining in the United States illegally, rather than to create a series of three separate offenses each contained in its own distinct watertight compartment. We feel the failure

to extend the employment proviso to "conceal" and "shield from detection" reflects merely a prudential limitation on the reach of the proviso, coupled with the recognition that "harbor" is perhaps a somewhat broader concept than "conceal" or "shield from detection," rather than an indication that Congress intended to provide for three distinct and separate offenses in subparagraph (3).

The full reach of section 1324(a)(3) in every imaginable situation is not before us. We need not determine in this case whether one can conceive of willful or knowing conduct tending to substantially facilitate an alien's remaining in the United States illegally that nevertheless might not be within a fair reading of the words knowingly or willfully harboring, concealing or shielding from detection an illegal alien or attempting to do so. Plainly, in the case at bar the evidence authorized the jury to find that appellant knew Correa and Torres were illegal aliens and warned them of the presence of the immigration officers so that they might escape apprehension, detection and deportation by the INS. Such conduct is clearly within the prohibition of subparagraph (3).

disturbed only for an abuse of discretion. *United States v. Benton*, 637 F.2d 1052, 1056 (5th Cir. 1981). No abuse of discretion is shown here.

The fact that the records did not show that appellant's prior conduct was criminal is immaterial. Rule 404(b) authorizes the admission of prior "acts" as well as "crimes" and "wrongs." Although one of the prior acts occurred slightly more than ten years prior to trial, and was hence outside the time limit provided for in Fed.R. Evid. 609(b), evidence admitted under Rule 404(b) is not controlled by the ten-year limit specified in Rule 609(b), which applies to the quite different matter of admitting evidence of prior convictions to impeach a witness. Of course, if the prior crimes or acts admitted under Rule 404(b) are too remote in time, this may substantially weaken their probative value and hence weigh in favor of their exclusion under Rule 403.

The evidence here was particularly relevant to show appellant's knowledge concerning the practices and procedures of immigration officers and the required documentation for alien workers. We observe that to the extent such prior acts are relevant to the matter of knowledge, rather than being relevant only to intent, remoteness may be less of a factor in determining the probative value of the evidence. The passage of time and changing circumstances are more likely to significantly change one's intent than they are to obliterate knowledge once gained.

We also note that prior to the offer of this evidence by the government, appellant had cross-examined the agents Garcia, Vasquez and Marroquin in an effort to show the numerous circumstances under which one not a citizen of the United States might be legally working in this country, including the case of an alien married to a United States citizen. The appellant was obviously seeking to show that he would not necessarily realize that Correa and Torres were illegal aliens, even though he might realize that they were not United States citizens. Accordingly, appellant's prior experience with the INS and the requirements applicable to alien workers, and particularly the orders for his own deportation notwithstanding his claimed marriage to an American citizen, were especially relevant.[6] The evidence was also relevant to appellant's knowledge of the procedures followed by the immigration officers in apprehending and deporting aliens. It tended to show that appellant's purpose in advising Correa and Torres of the presence of the immigration officers was not, as appellant's counsel contended in arguing his motion for instructed verdict, "entirely innocent" or simply the equivalent of "the fire department is here," but was instead an attempt to shield those particular aliens from detection by the INS.

These records also reflected that appellant had been apprehended after having entered by crossing the river near Eagle Pass, and that his hometown was Aposeo El Grande, in the state of Guanajuato, Mexico. This would be relevant to appellant's awareness that illegal aliens from that part of Mexico could be found working in the area. The inference of appellant's knowledge of the illegal alien status of Correa and Torres was also strengthened by the fact that, as these documents together with other evidence showed, his home state was the same as that of these two individuals, his hometown the same as that of one of them, and that they, too, had crossed near Eagle Pass. The probative value of this evidence was likewise enhanced by other evidence which showed that appellant's brother, also an illegal alien, was captured on the occasion in question at the D & B Materials Company plant site while attempting to escape from the INS.

We think these documents were highly relevant to the issue of appellant's knowledge and state of mind, and that the trial

---

**6.** The records, and testimony explaining them, showed that appellant, despite his marriage to a United States citizen, continued in the status of an alien illegally in this country unless and until a proper visa was obtained following application first by his spouse and then by himself.

court did not abuse its discretion in admitting them into evidence.

Having considered all of appellant's contentions, and finding each of them to be without merit, we accordingly affirm appellant's conviction.

AFFIRMED.