UNITED STATES of America, Appellee,

v.

Michael J. FIELDS,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

James P. BRAMBLE,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Vincent MacPHERSON,
Defendant, Appellant.

Nos. 87–1748, 87–1749 and 87–1758.

United States Court of Appeals,
First Circuit.

Heard Sept. 14, 1988.

Decided March 29, 1989.

Rehearing and Rehearing En Banc
Denied in No. 87–1749 May 12, 1989.

Michael Liston, Boston, Mass., by Appointment of the Court, for defendant, appellant Michael J. Fields.

Martin G. Weinberg, by Appointment of the Court, with whom Lillian A. Wilmore and Oteri, Weinberg & Lawson, Boston, Mass., were on brief, for defendant, appellant Vincent MacPherson.

Janis M. Berry, by Appointment of the Court, with whom Christopher R. Hall and Ropes & Gray, Boston, Mass., were on brief, for defendant, appellant James P. Bramble.

Ralph D. Gants, Asst. U.S. Atty., with whom Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., was on brief, for appellee.

Before TORRUELLA and SELYA, Circuit Judges, and ATKINS,* Senior District Judge.

ATKINS, Senior District Judge.

The appellants James Bramble, Michael Fields, and Vincent MacPherson attack their convictions for conspiracy, bank robbery, and Hobbs Act violations asserting six grounds of error. Because this court finds no error in the trial proceedings, the convictions are affirmed.

On April 1, 1983, three men, masked and armed, robbed the Central Savings Bank of Lowell, Massachusetts, and escaped with $65,791 in cash. On April 14, 1983, four men robbed an armored car during its morning delivery to the Fall River Trust Company in Fall River, Massachusetts, netting $140,430 in cash and $19,750 in food stamps. A six count indictment charged Edward Seeley and the appellants James Bramble, Vincent MacPherson, and Michael Fields with conspiracy in violation of Title 18 U.S.C. § 371, conspiracy to interfere with commerce by robbery and interference with commerce by robbery both in violation of Title 18 U.S.C. § 1951, armed bank robbery, in violation of 18 U.S.C. § 2113(d), and possession of money stolen from a federally insured bank in violation of 18 U.S.C. § 2113(c). A superseding indictment charged the appellant MacPherson with use of a firearm to commit a felony in violation of 18 U.S.C. § 924(c)(1), a charge later dismissed by the government.

Count one charged all four defendants with a conspiracy beginning in September of 1982, and continuing through and beyond May of 1983, whose purpose was to

---

* Of the Southern District of Florida, sitting by designation.

rob banks and armored cars, divide and spend the proceeds, and avoid being caught by law enforcement. Count two charged all four defendants with conspiring to interfere with commerce by robbing the Central Savings Bank in Lowell and the armored car in Fall River. Count three charged Seeley, Bramble, and Fields with interfering with commerce by robbing the Central Savings Bank in Lowell. Count four charged Seeley, Bramble, and MacPherson with interfering with commerce by robbing the armored car in Fall River. Count five charged Seeley, Bramble, and MacPherson with armed robbery of the Fall River Trust Co. which owned the cash and stamps being delivered by the armored car service. Finally, count seven charged Edward Seeley and James Bramble with knowing possession of money stolen from a federally insured facility, the Fall River Trust Co.

The appellants Fields, Bramble, and MacPherson were tried together. Edward Seeley, who eluded capture until Bramble, Fields, and MacPherson were tried and convicted, was tried separately and convicted on all counts.

### FACTS

The Original Restaurant, a common denominator during 1982 and 1983 for the individuals in this case, was run by James Bramble and Edward Seeley and owned in equal shares by their wives. Vincent MacPherson worked at the Original as a dishwasher and Michael Fields was employed during 1982 and 1983 as the "pizza man." Both Seeley and MacPherson resided at the Boston Pre-release Center and were released Monday through Saturday to work at the Original; they departed the Center each morning and drove to work in Seeley's car.

In May of 1982, Robert Wayne escaped from the Northeastern Correctional Center and returned to the Boston area where he reacquainted himself with Edward Seeley. It was at the Original that Wayne met his girlfriend Gail Brown in the fall of 1982. Gail Brown's testimony about conversations with Robert Wayne formed an important basis of the government's case.

Through Ms. Brown's testimony which was corroborated by additional evidence, the government pieced together the events surrounding the two robberies in question.

Robert Wayne began his association with Seeley and Bramble by stealing cars that would later be used in the robberies, cars that could not be easily identified bearing license plates stolen from other vehicles. On February 3, 1983, Wayne, accompanied by Gail Brown who watched from a distance, stole over $3,000 worth of meat from a market in Newton, Massachusetts; James Bramble accepted delivery of that meat from Wayne the following day at the Original. On another occasion, Wayne was pursued and arrested by police for the theft of a truck. Edward Seeley provided his bail and Wayne repaid this debt from money that he had stolen from a victim who corroborated the details of that crime.

In March of 1983, Wayne related to Gail Brown the details of the upcoming Lowell bank robbery that he was planning with Seeley, Bramble, and "Bo," a nickname for Michael Fields. On March 25, Wayne told Ms. Brown that, although he had gone to Lowell with Jack, a participant who remains unidentified, and Bo, a fallen power line forced a postponement of their plan; this was corroborated by the testimony of a police officer who directed traffic around a faulty telephone pole on that morning. Ms. Brown also testified that Wayne told her the event had been rescheduled for April 1, because the armored car made its deliveries on Fridays.

On March 31, Wayne confided the plans for the following morning to Brown. He was to meet Jack and Bo in Lowell where they would wait for the armored car to make its deposit. Jack was to provide the masks and guns. After the armored car's appearance, the three would enter the bank where Bo would keep time, Wayne would empty the tellers' drawers, and Jack would remove the armored car's deposit from the safe. A getaway car would be waiting to transport them to their separate means of escape. Jack and Bo planned to return together to the Original where they would meet Wayne. Wayne told Ms. Brown that

he was to return alone, traveling by train. Instead, they decided that Brown would follow him in the morning, wait for him, and drive him back. Before they left home in the morning of April 1, Wayne replaced a flat tire on the car he would drive to Lowell with a spare from the trunk of the car driven by Brown. The owner of the car driven by Wayne testified that, when his car was recovered, the front tire had been replaced.

Wayne and Brown drove to Lowell in separate stolen vehicles. Wayne telephoned his father to tell him that something important was imminent. While waiting for Wayne to return to their appointed meeting site, Brown caught a glimpse of a car containing Wayne and two others. One individual she recognized as Jack; she was unable to identify the other.

Lowell Central was robbed at approximately 10:15 a.m. on April 1, 1983. Because of a difficulty experienced by one of the conspirators, the three departed the bank later than planned and were pursued, but not caught, by police, an occurrence related by Wayne to Gail Brown and later corroborated by the testimony of a participating police officer. The three men returned to the Original where they divided the proceeds of the robbery.

Between 11:00 a.m. and 1:00 p.m. on that same day, Fields telephoned his girlfriend and told her that he had won a large sum of money betting on a basketball game and suggested that they fly to Florida. In the evening of April 1, Fields purchased airline tickets to Florida where the couple spent two weeks at a hotel. After returning to Boston, Fields purchased a car and insured it. All of these transactions occurred between April 1 and April 21, amounted to more than $5,800, and were conducted in cash.

Wayne and Brown stayed in a hotel on the night of April 1. The reservation had been made and guaranteed by Edward Seeley and the room paid for in cash. When Wayne checked out on April 4, James Bramble accompanied him to a rental agent to select a new apartment, paid the security deposit, agent's fee, and first several weeks' rent in cash. Brown testified that, although Seeley and Bramble intended that Wayne distance himself from her, he continued to bring her to this new apartment. She was cautioned, however, not to let Seeley or Bramble know of her presence.

On the night of April 14, Wayne briefly related to Gail Brown the details of an armored car robbery. She only recalled Wayne stating that Seeley and Bramble had planned the event, Jack and Bo took part, and that Jack, dressed as a mailman, was the lookout. She remembered that the proceeds consisting of cash and food stamps had been divided five ways.

The government presented the testimony of Beatrice Lake whose habit included an early morning walk in the Fall River area. Ms. Lake noticed a postman at Robeson Street and New Boston Road in the morning of April 11. When she encountered the same postman the following morning, he greeted her. Ms. Lake easily identified James Bramble as that postman.

James Bramble was also identified by a police officer who had noticed him standing on that corner for several mornings prior to the robbery. Officer Keighley, the passenger guard of the armored car, also identified Bramble as the postman. This same officer recalled having seen a man in a delivery uniform and baseball cap leaning against the bank when the armored car arrived and later positively identified that individual as Vincent MacPherson; Officer Keighley later identified Michael Fields as the third participant.

Seeley and MacPherson routinely departed the Boston Pre–Release Center at 8:00 a.m. and drove to the Original Restaurant. On the mornings of April 13 and 14, Seeley and MacPherson, using Wayne's keys, left the Center at approximately 6:30 a.m. The logbook which recorded the residents' departure and arrival times had been altered to conceal this fact. On April 26, Vincent MacPherson purchased a car with $6,440 in cash.

Wayne admitted to his stepfather that he had committed the Lowell and Fall River robberies and that he and his group were planning others. On May 7, Wayne left

Gail Brown in his apartment and headed to a meeting at the Original. He never returned. Later that evening, Vincent MacPherson, using Wayne's keys, let himself into Wayne's apartment. Confronted by Brown, he claimed that Wayne allowed him to use the apartment for showers. Brown noticed that Wayne's personal effects had disappeared. Wayne was discovered the following morning, murdered.

MacPherson returned to Wayne's apartment on May 8 and 9, and again entered without knocking or ringing the doorbell. He discouraged Brown from calling police or hospitals and told her that he would check for Wayne at the Original. On May 12, Wayne's body was identified and Gail Brown began cooperating with the police.

## DECLARATIONS AGAINST INTEREST

■ The appellants contend that the admission of Robert Wayne's out of court statements through the testimony of Gail Brown violated the confrontation clause of the Constitution. The appellants also claim that Robert Wayne's use of cocaine prevented him from evaluating whether the statements were against his interest and therefore the statements are presumptively unreliable. Because we find no error in the trial court's admission of the statements, we reject the appellants' arguments.

Rule 804(b)(3) of the Federal Rules of Evidence excepts a statement of an unavailable declarant from the general proscription against hearsay if, when the declaration was made, it "so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Fed.R.Evid. 804(b)(3). The rule expressly requires that "[a] statement tending to expose the declarant to criminal liability and offered to *exculpate* the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." (emphasis added) In this case, however, we are considering statements uttered outside the realm of the courtroom that inculpate an accused. The rule contemplates admission of such statements but does not by its terms regulate their introduction. *See* Fed.R.Evid. 804(b)(3) advisory committee's note. The draftsmen of the rule "left to the courts the task of delineating prerequisites to the admissibility of inculpatory against-interest hearsay," with "the central underpinning of such a safeguard ... the confrontation clause of the United States Constitution." *United States v. Alvarez,* 584 F.2d 694, 700 (5th Cir.1978). The appellants urge that the confrontation clause mandates, although the rule does not so expressly provide, that admission of against-penal-interest hearsay that inculpates an accused be conditioned on corroboration.

Several circuits have judicially grafted a requirement onto the rule that an inculpatory declaration be corroborated by other "indicia of reliability," *see, e.g., United States v. Riley,* 657 F.2d 1377, 1383 (8th Cir.1981); *United States v. Palumbo,* 639 F.2d 123, 131 (3d Cir.1981); *United States v. Oliver,* 626 F.2d 254, 260 (2d Cir.1980); *United States v. Alvarez,* 584 F.2d at 700, or circumstances clearly indicating its trustworthiness. *Alvarez,* 584 F.2d at 701. The court in *Alvarez,* upon which the appellants rely so heavily, opined that trustworthiness may be determined by analysis of two elements: (1) the probable veracity of the in-court witness, and (2) the reliability of the out of court declarant. 584 F.2d at 701 (citing *United States v. Bagley* 537 F.2d 162, 167 (5th Cir.1976)). This circuit has not considered whether the admission of all inculpatory statements against penal interest must be conditioned upon corroboration nor need we do so here since the facts adduced in the record are more than sufficient to corroborate Wayne's extrajudicial statements.

The appellants do not challenge the veracity of the in-court witness, in this case Ms. Brown. Turning to the second prong, the *Alvarez* court noted that "the traditional surety of reliability" of the out of court declarant is "the statement's contravention of the declarant's interest." 584 F.2d at 701. The statements uttered by Robert Wayne and recounted by Gail Brown were indisputably against Wayne's penal interest

and, in fact, the appellants do not argue that they were not. Although the appellants do not dispute that Wayne's statements were such that a reasonable person in his position would not have spoken them unless believing them to be true, they urge that Wayne's addiction to cocaine and his substance abuse deprived him of the capacity to appreciate this fact; the inability to judge the impact of the statements on the declarant's penal interest robs the statements of their trustworthiness and makes their admission inimical to the goals of the confrontation clause. None of the cases cited by the appellants supports this conclusion.

In *United States v. Sheard*, 473 F.2d 139, 149 (D.C.Cir.1973), the declarant was a chronic alcoholic "with a deteriorating, incomplete, and sporadic memory—and specifically on the night in question—highly intoxicated...." In fact, the circumstances of the case demonstrate that the investigating officers had difficulty arousing the declarant from his sleep because of his intoxication. In *United States v. Palumbo*, 639 F.2d 123, 133 (3d Cir.1981), the declarant's personal history was "marked by frequent use of drugs and treatment for psychological disorders" which the court found "further weaken[ed] her trustworthiness." Finally, the court in *State v. Gervais*, 317 A.2d 796, 802 (Me.1974), examined the trial court's admission of an inculpatory statement and recognized that the lower court did not exclude the out of court statement absolutely. Instead, the court offered the defendant the opportunity to prove that the declarant made the exculpatory statement voluntarily.

None of the cases supports a position that would exclude all against-penal-interest statements when there is also evidence of drug use. Each case examined the particular circumstances surrounding the statements and considered as one indication of reliability, substance abuse. In the case before this court, the evidence does not conclusively demonstrate that Wayne's use of cocaine rose to a level that impaired his

ability to judge his actions or conversations. The record does show that much of what Robert Wayne related to Gail Brown was corroborated by witnesses, identification testimony, and other direct as well as circumstantial evidence. Wayne recognized Seeley's concern about Gail Brown and Seeley's intention that Wayne distance himself from her. In fact, Wayne took measures that led the other conspirators to believe that he no longer associated with Ms. Brown. His statements and his actions belie the appellants' contention that he was unaware of the import of his conversations with Ms. Brown. We conclude that the trial court did not err when it admitted the testimony of Gail Brown.

### OTHER CRIMES EVIDENCE

The district court admitted evidence of a meat theft, liquor truck theft and resulting arrest, and "snatch and grab" robbery, all carried out by Robert Wayne. The appellants contend that admission of this evidence, which they assert is irrelevant to the crimes charged, permitted the jury to convict them for Wayne's crimes.

The trial court initially found that the incidents were admissible as statements against interest under Rule 804(b)(3) of the Federal Rules of Evidence. At the close of evidence, however, the court conducted a *Petrozziello* [1] hearing at which it concluded that the events qualified as statements of a co-conspirator under Rule 801(d)(2)(E). A district court's findings of fact in applying the *Petrozziello* test must be accepted unless clearly erroneous. *United States v. Patterson*, 644 F.2d 890, 894 (1st Cir.1981) (citations omitted).

Rule 801(d)(2)(E) requires that the statement by a co-conspirator have been made "during the course of and in furtherance of the conspiracy." The appellants argue that they were charged only with a conspiracy to rob banks and thus the crimes committed by Wayne were not in furtherance of the conspiracy. But the appellants' view

---

1. *See United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977) (whether it is more likely than not that the declarant and the defendant were members of a conspiracy when the statement was made and whether the statement was in furtherance of the conspiracy).

requires a too restrictive interpretation of the rule and is not in harmony with this circuit's precedent.

■ The record demonstrates that the disputed events occurred well within the time frame of the crimes charged in the indictment. *See, e.g., United States v. Kaplan,* 832 F.2d 676, 685 (1st Cir.1987). When a party knowingly boards the "conspiracy train," he assumes responsibility for all conduct whether or not he is conscious of its extent. *United States v. Baines,* 812 F.2d 41, 42 (1st Cir.1987). The declarations must have advanced the objectives of the scheme, *Kaplan,* 832 F.2d at 685, but there is "no talismanic formula for ascertaining when a conspirator's statements are 'in furtherance' of the conspiracy." *United States v. Reyes,* 798 F.2d 380, 384 (10th Cir.1986) (citations omitted). The *Reyes* court concluded that it is sufficient that the statements were intended to promote conspiratorial objectives. *Id.* In *United States v. Moody,* 778 F.2d 1380, 1383 (9th Cir.1985), *modified on other grounds,* 791 F.2d 707 (9th Cir.1986), the court upheld a determination that declarations made during the planning stages of a drug conspiracy concerning travel arrangements to procure drugs were admissible. In *United States v. Rahme,* 813 F.2d 31 (2d Cir.1987), the court admitted statements in furtherance of a conspiracy which were efforts to reassure a co-conspirator of the ability to produce heroin. In *United States v. Heinemann,* 801 F.2d 86, 95 (2d Cir. 1986), the court allowed statements persuading a co-conspirator to remain in the conspiracy to be admitted as in furtherance of the conspiracy. *See also United States v. Paone,* 782 F.2d 386, 391 (2d Cir.1986) (in furtherance requirement met when the statements are designed to induce the conspirator's assistance). Although we are concerned with physical acts rather than verbal ones, this circuit implicitly found that such a distinction warrants no difference in treatment. *See Baines,* 812 F.2d at 42.

■ In this instance, the court determined that the acts committed by Wayne were akin to a "hazing" by which Wayne proved his capability and worth to join the conspiracy. *See, e.g., United States v. Mills,* 704 F.2d 1553, 1559 (11th Cir.1983) (some of the evidence referred to illegal acts not constituting elements of the crime but pertaining to the chain of events forming the context, motive, and set-up of the crimes charged). The *Mills* court observed that, when it is difficult to draw a line between the crime charged and other events with which it is "inextricably intertwined," such evidence is proper if linked in time and circumstance with the crime charged, 704 F.2d at 1559 (citing 2 J. Weinstein & M. Berger, Weinstein's Evidence § 404[10], p. 404-60 (1982)), or if it is necessary to complete the picture of the crime on trial. 704 F.2d at 1559 (citing *United States v. Wilson,* 578 F.2d 67, 72 (5th Cir. 1978)). Just as statements persuading a co-conspirator to remain within the conspiracy are "in furtherance of that conspiracy," statements and actions by which a co-conspirator proves his worth to carry out the aim of the conspiracy are in furtherance of that conspiracy and intended to promote its objectives. Therefore the trial court did not err when it admitted the disputed evidence.

### IDENTIFICATION EVIDENCE

James Bramble was identified by three individuals as a participant in the Fall River armored car robbery. Bramble argues that each identification procedure was conducive to irreparably mistaken identification. Over Bramble's objection, the court permitted the passenger guard of the armored truck to identify Bramble. He argues that, because the guard had accompanied officers during a search of the Original and had seen Bramble at the restaurant, the admission of the identification was in error. James Bramble was also identified by a police officer who observed Bramble for several mornings prior to the robbery. Bramble argues that because the officer observed Bramble at an impermissibly suggestive showup, admission of the identification evidence was an error. Finally, the government offered the identification testimony of Beatrice Lake who, while

walking her dog, had passed Bramble dressed as a postman on several occasions. Because Ms. Lake merely identified Bramble as an individual she had seen on the street prior to the crime, Bramble contends that the admission of her identification was an error. We reject each of these arguments.

The Supreme Court, in *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), concluded that reliability is the "linchpin" in deciding the admissibility of identification testimony. The Court directed attention to the factors indicating reliability previously set out in *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–383, 34 L.Ed.2d 401 (1972). *See also United States v. Alexander*, 868 F.2d 492, 494–496 (1st Cir.1989). They include the opportunity for the witness to view the defendant at the time of the crime, the witness's degree of attention, the accuracy of his prior description, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. 409 U.S. at 199–200, 93 S.Ct. at 382–383.

■ The armored car passenger guard was an experienced police officer with the Fall River Police Department and was working a second job as a part time security guard with the Berkshire Armored Car Services on the day of the robbery. Officer Keighley had sufficient opportunity to observe Bramble. Keighley watched as Bramble approached the other guard and threatened him with a gun. Keighley drew his gun and pointed it at Bramble. After dropping his gun on Bramble's instruction, Keighley watched as Bramble walked the other guard away from the car. Keighley had the advantage of complete daylight as well as two separate opportunities to observe Bramble. In *Manson*, the Court found persuasive that the observant was a trained and experienced officer who could be expected to pay attention to detail. The Court also noted that the officer was aware that his claimed observation would be subject to close scrutiny and examination at at trial. 432 U.S. at 115, 97 S.Ct. at 2253. Officer Keighley would have been aware of the importance of an accurate identification because of his training and experience and therefore it is logical to conclude that he was sufficiently attentive.

Officer Keighley positively identified Bramble at the Original restaurant one month after the Fall River robbery. Keighley again identified Bramble from photospreads three years after the crime. The officer failed to identify any individual from the first set of photographs. Those photographs contained only a photo of Edward Seeley. From a second set, Keighley was firm in his identification of Bramble. Officer Keighley's identification has sufficient indicia of reliability to conclude that its admission was not an error.

■ Although Officer Mederios did not observe Bramble at the scene of the crime, Medeiros noticed Bramble on several other occasions. Officer Medeiros regularly drove past the Fall River Trust Company on his way to pick up breakfast for prisoners being held at the Fall River Police Station. For several mornings prior to the crime, and on the very morning of the robbery, Medeiros noticed Bramble on the corner by the Fall River Trust Co. Medeiros had sufficient opportunity in the early morning light to view Bramble's features. The officer's attention to detail would have been piqued by the presence of a postman on the same corner, at the same time, for several mornings running. Medieros' identification came one month after his observation of Bramble. Again, like Keighley, Medeiros was certain of his identification.

■ Finally, Ms. Beatrice Lake identified the appellant Bramble. Ms. Lake walked her dog past Bramble in the morning of April 11, 1983. The following morning, Ms. Lake again noticed Bramble at the same corner; he greeted her giving her a second opportunity to observe his features. Ms. Lake testified that her attention was aroused because she had never seen a postman on that corner during the time of her regular morning walk; she paid special attention. She was given an opportunity to test her observation one month later when she positively identified Bramble from a series of black and white photographs.

Her initial identification and later in court identification were certain.

The trial court properly weighed and determined the reliability of the three identifications[2] and thus its admission of the evidence was not in error.

## RULE 404(b) EVIDENCE

■ The appellants object vehemently to the admission of evidence of the arrest of James Bramble and Michael Fields in 1986. The appellants argue that not only did the evidence lack any probative value, it so prejudiced the jury that it allowed Bramble and Fields to be convicted of crimes not charged in the indictment. We are not persuaded. The process of balancing the need for this type of evidence and its probative value with the risk of unfair prejudice is committed to the sound discretion of the trial court. *United States v. Rubio-Estrada*, 857 F.2d 845, 846 (1st Cir.1988); *United States v. Crocker*, 788 F.2d 802, 804 (1st Cir.1986) (citing *United States v. Fosher*, 568 F.2d 207, 212–13 (1st Cir. 1978)). In fact, "it is clear in this circuit that we will give the district court considerable leeway on this matter." *United States v. Simon*, 842 F.2d 552, 555 (1st Cir.1988) (citing *Crocker*, 788 F.2d at 804); *United States v. Zeuli*, 725 F.2d 813, 816 (1st Cir.1984); *United States v. Eatherton*, 519 F.2d 603, 611 (1st Cir.1975). The trial court in this instance did not abuse its discretion in admitting the disputed evidence and thus we find no error.

Rule 404(b) of the Federal Rules of Evidence regulates the admission of evidence of other crimes, wrongs, or acts:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b). This list is not exhaustive, *see* J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 404[08], at 404–57, "for

the range of relevancy outside the ban is almost infinite; and further, ... the purposes are not mutually exclusive for the particular line of proof may fall within several of them." McCormick, Evidence § 190 at 448 (Cleary ed. 1972). The rule is one of inclusion which allows the introduction of evidence of other crimes, wrongs, or acts unless the evidence tends to only prove criminal disposition. *See United States v. Zeuli*, 725 F.2d at 816; *United States v. Ford*, 632 F.2d 1354, 1375 (9th Cir.1980).

■ This circuit has articulated a two prong analysis for determining whether evidence of other acts is admissible. The trial court must first determine that the proffered evidence has a "special" relevance and is offered to establish a material issue. *United States v. Gonzalez–Sanchez*, 825 F.2d 572, 579–80 (1st Cir.1987). Once the court has determined that a proper basis for admission exists, it must balance the probative value of the evidence against the possibility of unfair prejudice to the defendant. *Id.*

The "crux" of the Rule 404(b) probativeness analysis is the "special" relevance to something other than propensity to engage in criminal activity. *United States v. Lynn*, 856 F.2d 430, 436 (1st Cir.1988). The evidence in this case showed that, on the morning of May 12, 1986, James Bramble and Michael Fields, driving a stolen automobile, ran a red light and were pursued and stopped by a police officer. Ignoring the officer's command to freeze, Bramble and Fields ran from the car and headed for a brown Oldsmobile parked on a hill. Fields stopped behind the Oldsmobile and the officer noticed that he was disposing of something underneath the car. When this vehicle was later moved, a stolen handgun was discovered on the ground.

A search of Bramble revealed a stolen revolver tucked into the rear of his pants below the belt line, a wool stocking mask, leather gloves, and a portable scanner programmed to listen to various local and state police departments. A search of the stolen Pontiac uncovered a ski mask, a

---

**2.** The court also gave a proper instruction to the   jury.

single driving glove concealing the absence of the ignition locking assembly, and a nylon mesh bag. The Pontiac displayed a license plate from another vehicle. A similar search of the Oldsmobile turned up a package of plastic gloves, a stolen Massachusetts license plate, binoculars, a traffic ticket, and a registration and application for a limited service contract, both in Bramble's name.

Fields and Bramble argue that intent, the purpose for which the court admitted the evidence, was not at issue. They contend that, except for being employed at the Original, neither Fields nor Bramble are identified as participating in any other overt act, as present or participating in any planning or agreement, or as making any statement with respect to or in furtherance of the conspiracy. The appellants argue that, although there was evidence of an association through the Original with the other conspirators, the government did not rely upon this fact to establish their participation in the conspiracy.

■ The appellants' argument suggests that their association with the other conspirators, which they do not deny, was of an other than criminal nature and merely grew out of their mutual workplace, the Original. Evidence of a conspirator's post conspiracy activity is admissible if probative of the existence of a conspiracy or the participation of an alleged conspirator, "even though they might have occurred after the conspiracy ended." *Anderson v. United States*, 417 U.S. 211, 219, 94 S.Ct. 2253, 2260, 41 L.Ed.2d 20 (1974) (quoting *Lutwak v. United States*, 344 U.S. 604, 618, 73 S.Ct. 481, 489, 97 L.Ed. 593 (1953)); *United States v. Veal*, 703 F.2d 1224, 1230 (11th Cir.1983); *United States v. Nathan*, 476 F.2d 456, 459–60 (2d Cir.1973); *United States v. Bennett*, 409 F.2d 888, 893 (2d Cir.1969).

Probative value must be considered in light of the remoteness in time of the other act and the degree of resemblance to the crime charged. M. Graham, Handbook of Federal Evidence, § 404.5, at 221–22 (2d ed. 1986). In the present case, the trial court noted the numerous similarities between

the 1986 incident involving Bramble and Fields and the crime charged in the indictment. The appellants argue that the asserted commonalities between the May 1986 incident and the Central Savings Bank robbery were too attentuated to be probative. The cases cited by the appellants in support of this point are easily distinguishable. In *United States v. Myers*, 550 F.2d 1036 (5th Cir.1977), the government introduced evidence of a prior bank robbery to prove identity. The *Myers* court remarked that a "much greater degree of similarity between the charged crime and the uncharged crime is required when the evidence of the other crime is introduced to prove identity" than when it is introduced for another of the myriad of reasons allowable under Rule 404(b). 550 F.2d at 1045. In this case, the trial court did not admit the evidence as proof of identity but admitted it as proof of the nature of the association between Bramble, Fields, and the other conspirators in 1983. Bramble and Fields both possessed the instrumentalities of a bank robbery, stolen guns, masks, money bag. They were driving a stolen car with a license plate stolen from another vehicle. When they were stopped, both Bramble and Fields ran toward yet another car that was parked as though providing the means of escape. It is true that these similarities are most likely insufficient to show a "signature," however, they are sufficiently similar to be probative of the character of the association between Bramble and Fields in 1983. *See United States v. Andiarena*, 823 F.2d 673, 677 (1st Cir.1987) (evidence admitted of involvement with same individuals prior to conspiracy charged); *Crocker*, 788 F.2d at 804 (event and defendant's participation and prior involvement with co-conspirator had sufficient similar elements with his participation and involvement in the conspiracy to make it relevant and highly probative); *United States v. Ismail*, 756 F.2d 1253, 1259 (6th Cir.1985) (evidence of prior joint scheme between the defendants relevant to the true nature of their relationship).

The appellants also argue that the subsequent act in this case was too distant in time to be probative. Although proximity

in time is a factor to be considered, Rule 404(b) is not constrained by the ten year limitation applicable to Rule 609(b). Of course, if the acts admitted under rule 404(b) are too remote in time, this substantially weakens their probative value and weighs in favor of exclusion. This is especially true in cases in which the evidence is probative of intent. *See United States v. Rubio–Gonzalez*, 674 F.2d 1067, 1075 (5th Cir.1982) ("[T]o the extent such prior acts are relevant to the matter of knowledge, rather than being relevant only to intent, remoteness may be less of a factor in determining the probative value of the evidence. The passage of time and changing circumstances are more likely to significantly change one's intent than they are to obliterate knowledge once gained."). In *Rubio–Gonzalez*, the prior act occurred more than ten years before the crime, the conviction from which the defendant appealed. The court found that the evidence was "particularly relevant." *Id.* In *Crocker*, the court found probative of the defendant's criminal knowledge and intent a seven year old arrest. 788 F.2d at 804. *See also United States v. Cuch*, 842 F.2d 1173, 1178 (10th Cir.1988) (eight year old incident of assault probative and admissible to show intent); *United States v. McCollum*, 732 F.2d 1419, 1424, n. 3 (9th Cir. 1984) (twelve year old conviction for bank robbery probative for offense requiring same intent); *United States v. Franklin*, 704 F.2d 1183, 1189 (10th Cir.1983) (four year old conviction relevant); *United States v. Terry*, 702 F.2d 299, 316 (2d Cir.) (20 year old conviction admissible for intent and knowledge), *cert. denied sub nom Williams v. United States*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983). It is evident that there is no absolute rule governing the number of years that can separate offenses. The court must apply a reasonableness standard that examines the facts and circumstances of each case. *United States v. Engleman*, 648 F.2d 473, 479 (8th Cir.1981). In this case, neither the span of three years, nor the fact that they occurred after the charged crimes rather than before, weakened the probative value of the appellants' subsequent acts. The

evidence shed light on the nature of their association at the time of the crimes charged and thus possessed a "special" relevance.

Having determined that the admitted evidence was probative of a material issue, it is important to examine whether that probative value was substantially outweighed by unfair prejudice to the appellants. "The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence in view of the availability of other means of proof...." *See* Fed.R.Evid. 404(b) advisory committee's note. The true nature of Bramble's and Fields' association was not affirmatively demonstrated by any other evidence, a factor which favors admission. *See* 2 Louisell & Mueller, Federal Evidence § 140 at 116–17 (1978) ("[I]f there is simply no other practical means to prove the point, then the need factor points strongly toward receipt of other crimes evidence. If, on the contrary, the point is conceded, or strongly supported by other proof, then the need factor points toward exclusion, and should weigh heavily, perhaps decisively, on the scales.").

This circuit has recognized with approval the Fourth Circuit's standard which sanctions exclusion only "'in those instances where the trial judge believes that there is a genuine risk that the emotions of the jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence.'" *Zeuli*, 725 F.2d at 817 (quoting *United States v. Masters*, 622 F.2d 83, 87 (4th Cir.1980)). The Supreme Court has most recently spoken to this issue in *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). The Court noted that "Congress was not nearly so concerned with the potential prejudicial effect of Rule 404(b) evidence as it was with ensuring that restrictions would not be placed on the admission of such evidence." *Id.* 108 S.Ct. at 1501. The evidence in this case posed no risk of unfair prejudice. In addition, the trial judge gave an adequate limiting instruction when the evidence was presented and again in his instructions to the jury

after closing arguments. The evidence was properly admitted.

### EVIDENCE OF MURDER

■ The appellants challenge the trial court's admission of evidence of Robert Wayne's murder. They argue that the indictment charged the murder as an act of concealment which does not constitute an overt act of a conspiracy to commit a crime. We find no error in the court's admission of the evidence.

■ The indictment charged that "[i]t was a part of the conspiracy that members of the conspiracy would murder co-conspirator Robert M. Wayne." *See* Superseding Indictment at ¶ 27. Declarations and acts of co-conspirators made during the course of the conspiracy and made in furtherance of the conspiracy are admissible. *United States v. United States Gypsum Co.,* 333 U.S. 364, 393, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *Pinkerton v. United States,* 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946); *United States v. Davis,* 623 F.2d 188, 191 (1st Cir.1980). The Supreme Court has qualified this admission in a trilogy of cases that require that a co-conspirator's declaration or action be made before attainment of the conspiracy's central objective. *See Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); *Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953); *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). But the Court clarified this restriction.

> By no means does this mean that acts of concealment can never have significance in furthering a criminal conspiracy. But a total distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime.

*Grunewald,* 353 U.S. at 405, 77 S.Ct. at 974. *See Davis,* 623 F.2d at 191 ("The question ... then is whether the evidence was of acts and declarations made during and in furtherance of the conspiracy or was of acts and declarations made to conceal the conspiracy.").

The case before this court is factually distinguishable from *Grunewald* but in line with its teaching. The government alleged and proved a conspiracy to rob banks and armored cars which extended beyond the date of Wayne's murder. Wayne frequented the Original after the Fall River robbery and told Gail Brown and his father that he and his group were planning additional robberies. In fact, on the day he disappeared, Wayne was on his way to the Original to discuss "business." No evidence suggested that the conspiracy had been terminated or that any of the co-conspirators had withdrawn until after Wayne's death. Proceeds from the charged crimes were still to be distributed. *See, e.g., United States v. Etheridge,* 424 F.2d 951, 964 (6th Cir.1970) (quieting of a conspirator done "in furtherance of the conspiracy" and "within the scope of the unlawful project").

Thus the trial court did not err by admitting the disputed evidence as the record demonstrates that the conspiracy continued through the date of Robert Wayne's murder.

### SUFFICIENCY OF THE EVIDENCE

James Bramble contests the sufficiency of the evidence to convict him on count three and Michael Fields disputes that the evidence was sufficient to sustain the jury verdict against him on counts one, two, and three of the indictment. We disagree.

A jury must be able to infer and conclude beyond a reasonable doubt that a defendant is guilty of the crime charged. *United States v. Kaplan,* 832 F.2d at 679. When reviewing a verdict for sufficiency of evidence, all reasonable inferences must be drawn in the light most favorable to the government. *Id.* (citing *United States v. Rothrock,* 806 F.2d 318, 320 (1st Cir.1986)). It is also beyond dispute that a jury may find guilt beyond a reasonable doubt from circumstantial evidence. *Earle v. Benoit,* 850 F.2d 836, 844–45 (1st Cir.1988); *United*

*States v. Hicks*, 848 F.2d 1, 4–5 (1st Cir. 1988).

 Drawing all inferences in the light most favorable to the government, a juror could find, from the evidence produced, guilt beyond a reasonable doubt.

For the reasons so stated, the convictions appealed from are AFFIRMED.